IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOSHUA NESBITT<br>1629 Tucker Road<br>Fort Washington, Maryland 20744<br>301-573-3278 | )<br>)<br>)<br>)<br>)<br>) | RCL<br>Civil Action No. 12-717 (~~RWR~~) |
| Plaintiff,<br>v. | )<br>)<br>) | |
| ERIC H. HOLDER, JR.,<br>Attorney General, United States<br>Department of Justice | )<br>)<br>)<br>)<br>) | |
| Defendant | )<br>) | |

## PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

     Plaintiff, Joshua Nesbitt, *pro se*, hereby submits this Supplemental Opposition to

Defendant's Renewed Motion for Summary Judgment which was filed pursuant to Fed. R. Civ.

P. 56(b) and (c). Plaintiff hereby incorporates by reference the initial Opposition to Defendant's

Motion For Summary Judgment, Plaintiff's Statement of Material Facts As To Which There Is

No Genuine Dispute, and Plaintiff's Memorandum Of Points And Authorities In Opposition to

Defendant's Motion For Summary Judgment, including Exhibits A through BB, which was filed

with the Court on May 30, 2013.

     Plaintiff's Affidavit In Support of the Supplemental Opposition to Defendant's Renewed

Motion For Summary Judgment is attached hereto.

**RECEIVED**

JUN 1 9 2013

Clerk, U.S. District and
Bankruptcy Courts

Plaintiff has alleged in his employment discrimination complaint that he was denied promotion on the basis of race. Plaintiff is an African-American. Plaintiff alleges that the Defendant engaged in race-based discrimination through the unequal application of objective criteria, that is to say, that Defendant mandated Plaintiff's compliance with the application standards contained in the vacancy announcement in order for Plaintiff to qualify for promotion consideration. However, the Defendant considered the Caucasian Selectee's application despite the Selectee's failure to comply with the announced objective application standards and thus, despite the Selectee's failure to qualify for promotion consideration. Plaintiff was thereafter denied promotion despite being the most qualified applicant with a complete application.

Once the Plaintiff challenged the selection, the Defendant attempted to justify its continued consideration of the Selectee's application by falsely asserting the existence of a different application standard for internal applicants, such as Plaintiff and the Selectee, which did not require compliance with the objective application standard contained in the vacancy announcement. This deliberately false assertion is directly contradicted in writing by the Defendant's Director of Human Resources. In addition, the Defendant simultaneously asserted that no application standards were applied to any applicants, internal or external, but failed to explain what motivated the Defendant to abandon its publicly announced standards.

Defendant, Eric H. Holder, Jr., in his official capacity as Attorney General of the United States, by and through the United States Attorney for the District of Columbia, has failed to fully and candidly address this Court on the issue of the Defendant's contradictory positions regarding which application standard was in effect at the time of the Defendant's decision to consider the Selectee's application and to promote the Selectee.

Instead, while silent regarding the Defendant's prior assertion of a different application standard for internal applicants, and silent regarding the motivation for the abandonment of the publicly announced standard, the Defendant changes the subject, and asserts that based upon a comparison of the Plaintiff's and the Selectee's relative qualifications, the Plaintiff's claim of discrimination lacks merit. The Defendant thereafter asserts justifications which the Defendant characterizes as legitimate and non-discriminatory bases for the promotion decision.

Plaintiff submits that the Defendant's shifting and contradictory statements regarding the application standards in effect cannot be reconciled and are pretexts, that is to say, the Defendant abandoned the publicly announced application standard which was confirmed as applicable to internal applicants by its Director of Human Resources, falsely asserted the existence of a more lenient standard for internal applicants, and chose the Caucasian Selectee for promotion in order to avoid promoting an African-American into the management ranks of the Office of Intelligence, an office where no African-Americans serve in attorney supervisory positions.

In addition, Plaintiff submits that the qualifications-based justifications asserted by the Defendant are also pretextual, offered for the sole purpose of masking the race-based discrimination which was effectuated by the unequal treatment of the African-American Plaintiff and the Caucasian Selectee as described above.

As discussed more fully in the Plaintiff's Supplemental Memorandum Of Points And Authorities In Opposition to Defendant's Renewed Motion For Summary Judgment, the facts in dispute which Plaintiff submits preclude summary judgment are as follows: (1) whether there was, in fact, a different application standard for internal applicants which permitted the consideration of the Selectee's application, or whether that assertion by the Defendant was a false explanation, solely designed to mask a promotion decision which was the product of race-based

discrimination; (2) whether the Defendant, who admittedly deviated from the publicly announced

objective application standard, a standard confirmed as applicable to internal applicants by

Defendant's Director of Human Resources, did so for the purpose of effectuating a promotion

decision which was the product of race-based discrimination; and (3) whether a  reasonable jury

could conclude, based on the Plaintiff's factually supported rebuttal, that Defendant's asserted

non-discriminatory justifications are false and solely designed to mask a promotion decision

which was the product of race-based discrimination.


I affirm, under penalty of perjury, that the foregoing factual statements are true and correct

Joshua W. Nesbitt, *Pro Se*
1629 Tucker Road
Fort Washington, Maryland 20744
(301) 573-3278
joshuawnesbitt@yahoo.com


Sworn before me on this 19th day of June, 2013


TERESITA MUTTON
NOTARY PUBLIC



IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOSHUA NESBITT<br>1629 Tucker Road<br>Fort Washington, Maryland 20744<br>301-573-3278<br><br><br>          Plaintiff,<br>v.<br><br>ERIC H. HOLDER, JR.,<br>Attorney General, United States<br>Department of Justice<br><br><br>          Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 12-717 (RWR)<br><br>PLAINTIFF'S AFFIDAVIT IN<br>OPPOSITION TO DEFENDANT'S<br>RENEWED MOTION FOR SUMMARY<br>JUDGMENT |

## <u>AFFIDAVIT OF JOSHUA NESBITT</u>

I, Joshua W. Nesbitt, affirm the following under penalty of perjury:

1.     I am a black male of African-American descent, and have been employed by the
Defendant as an attorney since 1992 in the following positions: Assistant U.S. Attorney, Northern
District of New York (1992-1999); Trial Attorney, Organized Crime & Racketeering Section in
Washington, D.C. (1999-2006); Attorney, Office of Intelligence and its predecessor, the Office of
Intelligence Policy & Review (2006-2011); and Trial Attorney, Organized Crime Drug Enforcement
Task Force (OCDETF) (2011-present).  The content of this affidavit is based upon my personal
knowledge, and upon my review of the contents of the Record of Investigation prepared by the
United States Department of Justice in relation to the above-captioned matter.

2.      When I filed the formal complaint with the Department of Justice Office of Equal Employment Opportunity, I was an Attorney Advisor for the National Security Division (NSD), Office of Intelligence, GS-15, reporting to Ms. Nancy Newcomb (White Female), Chief of Litigation.

3.      The Office of Intelligence (OI) is divided into three Sections -- Operations, Oversight, and Litigation. The Operations Section is primarily responsible for drafting applications for electronic surveillance and physical searches under the authority of the Foreign Intelligence Surveillance Act (FISA). At the time of the events described below, and at the time of this writing, no attorneys of African-American descent served or currently serve in any attorney supervisory position in OI.

4.      The Operations Section is divided into three units. They are the Counterintelligence Unit, the Counterterrorism Unit, and the Special Operations Unit. Attorneys in the Operations Section appear before the FISA Court in non-adversarial ex parte proceedings held in a sealed courtroom, much like an Assistant U.S. Attorney and federal agent would appear before a United States District Court Judge or Magistrate Judge in a criminal setting when seeking the authority to conduct a wiretap or execute a search warrant.

5.      The Oversight Section is primarily responsible with ensuring that the intelligence agencies are in compliance with the law regarding electronic surveillance and physical searches conducted pursuant to FISA or other legal authority.

6.      The Litigation Section is primarily responsible for working with federal prosecutors who are engaged in espionage and/or terrorism prosecutions, and who want to use FISA-obtained or FISA-derived information in various aspects of the legal proceedings, such as evidence in their direct case, or providing materials which satisfy their Jencks, Brady, or Giglio obligations. In

addition to assessing the litigation risks associated with granting approval to use FISA information, the OI Litigation Section drafts several documents filed under seal for the in camera, ex parte review by the District Court when deciding a defendant's discovery or other motion request which might result in the disclosure of FISA applications, FISA Court orders, or other classified information, the disclosure of which would harm the national security of the United States. The Litigation Section also handles other matters not associated with FISA Litigation and is the smallest section in OI with, in 2010, a total of six line attorneys, J.N., D.F., R.C, K.T., M.D., and A.M. (four full-time, two part-time), plus the Chief and Deputy Chief.

7.      In 2009, after Ms. Newcomb's appointment to the position of OI's Litigation Section Chief, she discussed the desire for a Deputy Chief with Deputy Assistant Attorney General Tashina Gauhar. Together, Joyce Klitenic, the Director of Human Resources, Ms. Newcomb, and Ms. Gauhar, determined the general qualifications and responsibilities for the position of Litigation Section Deputy Chief.

8.      On April 22, 2010, Ms. Newcomb sent an office-wide e-mail to all potential internal applicants indicating the pending announcement regarding "the newly created position of Deputy Chief, Litigation Section, Office of Intelligence." In the e-mail message, Ms. Newcomb did not indicate that the application standards detailed in the forthcoming announcement were inapplicable to those attorneys already working in OI. Ms. Newcomb's e-mail also did not affirmatively indicate the existence of a separate application standard for internal applicants which would make the application process less cumbersome.

9.      On April 26, 2010, the public announcement for the Deputy Chief position was posted. Despite the description of the duties for the supervisory position which include working with the Section Chief and federal prosecutors in coordinating criminal and civil litigation related to FISA

and attending inter-agency meetings, the public announcement indicates that "past experience in the national security or intelligence field is not required," and contains no indication that prior supervisory/management experience is required, desired, or preferred.

10.     The "Department Policies" section indicates that the Department of Justice is an Equal Opportunity/Reasonable Accommodation Employer and goes on to specify its policy against discrimination on many bases, including race.

11.     To apply for the position, the "Application Process" section directs all applicants to submit a cover letter highlighting their relevant experience, a writing sample, a law school transcript, and a current performance appraisal, if applicable. The announcement directs applicants to send these materials to Joyce Klitenic.

12.     On April 26, 2010, I sent an e-mail inquiry to Ms. Klitenic, asking whether Plaintiff needed to submit a writing sample and transcript, since I had been in OI since 2006. Ms. Klitenic replied "**Yes, Please [sic] submit everything that is requested in the vacancy announcement**."(Emphasis added).

13.     After receiving Ms. Klitenic's response, later that day, I sent an e-mail message to Tammy Green, an NSD Human Resources staff member, requesting assistance in acquiring a copy of my law school transcript from my personnel file.

14.     Contrary to Ms. Klitenic's affidavit wherein she stated the Human Resources Office ... would have provided transcripts...upon request to Mr. Nesbitt, and to any other internal applicant, I received no response at all to the transcript request at any time prior to Mr. Ridge's selection.

15.     On April 27, 2010, Mr. Ridge sent an e-mail message to Litigation Section Chief Nancy Newcomb and Director of Human Resources, Ms. Klitenic, expressing his interest in the Deputy Chief's position and summarizing his qualifications. Mr. Ridge stated in the e-mail "**My**

**law school transcript should be on file somewhere within the Department and, if necessary, we can discuss what type of writing sample you would like to see in support of my application, although quite honestly, I don't get paid to write."** (Emphasis added).

16.     Mr. Ridge's e-mail, quite detailed in listing his supervisory experience, the awards that he had earned, and his work before the FISA Court, contains no claim to any experience working with federal prosecutors on FISA Litigation matters pending in the United States District Court.

17.     At no time prior to Mr. Ridge's selection did Ms. Klitenic direct Mr. Ridge to "Please submit everything that is requested in the vacancy announcement," as she had directed the I on the day before Mr. Ridge's e-mail and it is undisputed that Mr. Ridge did not submit his law school transcript or a writing sample prior to his selection as the Deputy Chief of Litigation.

18.     I contacted my law school and acquired my transcript.  While waiting for my transcript to arrive, I informed Ms. Newcomb that I intended to apply for the Deputy Chief position but was awaiting the receipt of my law school transcript.  Ms. Newcomb did not respond.

19.     On May 14, 2010,  I submitted a formal cover letter, a writing sample, a law school transcript, and a current performance appraisal to Ms. Klitenic's office, which detailed my 23 years as an attorney, including 14 years as a federal prosecutor, my 4 years in OI and my work on complex FISA Litigation matters in OI from 2007 through 2010.

20.     Prior to submitting my application, I had an informal discussion regarding the Deputy Chief's position with Nancy Newcomb on April 27, 2010.  Ms. Newcomb indicated that she wanted someone who could operate in her place, and someone who could attend meetings that her schedule did not permit.  At no time did Ms. Newcomb inquire of my past "high-level meeting" experience.

21.    On May 20, 2010, I had my formal interview with Ms. Newcomb.  One of the issues discussed was how I would address what Ms. Newcomb described as the "knowledge deficit" amongst the Litigation Section attorneys regarding the Federal Rules of Criminal Procedure and the Classified Information Procedures Act (CIPA).  I suggested that someone from NSD's Counter-Terrorism Section or Counter-Espionage Section be asked to give a presentation.  Once again, at no time did Ms. Newcomb inquire of my past "high-level meeting" experience.

22.    In addition, Ms. Newcomb neither expressed any concern about my conduct in meetings I attended at her direction while in OI or meetings I attended before I joined the Litigation Section, nor questioned me regarding any concerns Ms. Newcomb might have about my representing OI or the Litigation Section in meetings with other government agency personnel.

23.    My high-level meeting experience includes briefing Attorney General Ashcroft on the murder of an Assistant U.S. Attorney prior to General Ashcroft's network television appearance to discuss the case,  briefing  FBI Director Mueller on an arms-smuggling case, with witnesses and evidence from Asia and Europe, involving over 100,000 military weapons parts smuggled into the U.S. from Vietnam, and "deposing" the Director for a related Giglio filing, briefing the Criminal Division AAG, the U.S. Attorney, and Deputy AAG Keeney on the  murder investigation, briefing Deputy AAG Keeney and another Deputy AAG on the arms smuggling investigation, and briefing a U.S. Attorney concerning a complex FISA Litigation matter.  In addition, I have made  numerous appearances before the United States Court of Appeals for the Second Circuit where I was challenged and aggressively questioned by the panels of judges.

24.    On May 28, 2010, Ms. Newcomb sent an e-mail which announced Mr. Ridge's selection as the new Litigation Section Deputy Chief. In the e-mail message, Ms. Newcomb indicated that Mr. Ridge excelled in Operations and Oversight (an assessment which I do not

dispute), that he served for four years as a Deputy Chief in the Department of Justice's Capital Case Unit, and served 11 years as an Assistant State's Attorney in Miami. However, absent in Ms. Newcomb's e-mail was any mention of Mr. Ridge's FISA Litigation experience.

25.     On May 28, 2010, prior to the formal announcement of Mr. Ridge's selection, I was informed of the selection decision by Ms. Newcomb. Ms. Newcomb justified Mr. Ridge's selection to me by indicating that Mr. Ridge had litigation and supervisory experience, and knowledge of the FISA Amendments Act (FAA).

26.     At the same time that Deputy Assistant Attorney General Gauhar approved Mr. Ridge's selection as the Deputy Chief of Litigation, despite his lack of FISA Litigation experience, she also approved the selection of a supervisory attorney from the Operations Section to become the Deputy Chief of the Oversight Section, a section in which Mr. Ridge served with distinction, and where he received several awards for his work from 2008 to 2010.

27.     Back in 2009, prior to joining the Litigation Section, I had applied for another supervisory position in OI. Within a short time after my application was submitted, three events occurred: (a) after we had spoken on the telephone while I was out of the office, my supervisor, the Chief of the Counterintelligence Unit, wrote an e-mail message to the other Unit supervisors indicating that she had tried to reach me but that my number "appears not to be working;" (b) a Deputy Unit Chief and myself had made arrangements for the review and filing of a draft FISA application with the FISA Court. A colleague conveyed to me a rumor regarding my filing the draft which was factually inaccurate and which suggested that the draft would not be timely filed; and (c) after I transferred to the Litigation Section full-time in December 2009, my former supervisor, the Chief of the Counterintelligence Unit, invoked Ms. Newcomb's name, asking what Ms. Newcomb might think about a substantive communications I had with the FBI about which the Chief of the

Counterintelligence Unit was voicing a complaint, in a matter unrelated to Ms. Newcomb's or the Litigation's responsibilities.

28.     Being unaware of any prior problems between myself and OI supervisors prior to my application for a supervisory position, I concluded that these three events might suggest an attempt to disparage my professional reputation as one who (a) leaves bad contact information while away from the office; (b) doesn't meet his FISA Court filing deadlines, and (c) doesn't communicate responsibly with the FBI, thereby making me an unattractive candidate for promotion.

29.     Because of these events 2009 which occurred immediately after I submitted an application for promotion, and the facts stated above relating to the selection of the Deputy Chief of Litigation, in June 2010, I made preliminary contact with the Department of Justice Office of Equal Employment Opportunity (EEO).

30.     In August 2010, EEO sent questions to the Defendant regarding the application process for the selection of the Deputy Chief of Litigation.  Several of the questions requested information regarding what I mistakenly believed was the late submission of Mr. Ridges's law school transcript, as opposed to his complete failure to submit one, and any communications between the Defendant and Mr. Ridge regarding the late submission.  In addition, EEO posed questions regarding the nature of Mr. Ridge's writing sample and the bases upon which it was judged superior to my writing sample.

31.     In September 2010, the Defendant responded to EEO's questions and presented several ostensibly non-discriminatory bases for Mr. Ridge's selection.  The letter was written by Ms. Janice Kaye, Of Counsel for the Defendant on the instant motion.  However, according to Ms. Kaye, the information contained in the Defendant's letter to EEO was provided by Joyce Klitenic, Nancy Newcomb, and Tashina Gauhar.

32.      In response to EEO's questions regarding Mr. Ridge's law school transcript and writing sample,  Ms. Klitenic, Ms. Newcomb, and Ms. Gauhar, indicated that "**Although the posting did not differentiate between internal and external candidates, internal candidates did not have to submit a law school transcript, current performance review or writing sample for their application to be considered complete because these materials already were available to NSD staff**." (Emphasis added).

33.      I do not believe that the Defendant's statement to EEO is credible because it fully contradicts the April 26, 2010, direction from Ms. Klitenic to me, an internal candidate, to comply with the application standard contained in the vacancy announcement.

34.      On or about September 13, 2010, I met in EEO's office with Ms. Kaye and Mr. Donald Vieira, the then-AAG's Chief of Staff.  When I produced Ms. Klitenic's email, it appeared to me that Ms. Kaye and Mr. Vieira were surprised and caught off guard.  After a break in the proceeding, Ms. Kaye and Mr. Vieira returned to tell me that the Defendant just forgot to tell the me of the different application requirements for internal candidates.  I do not believe that statement is credible because I recall no office-wide email or any other office-wide communication informing the pool of potential internal applicants of an application standard different from that contained in the vacancy announcement.  Therefore, it wasn't just me who was not told of the more lenient application standard.

35.      Afterwards, in their respective affidavits, Ms. Newcomb and Ms. Klitenic also asserted that all application standards were abandoned for everyone in the selection process, all applicants, internal and external, indicating that there was no process to screen, rate, or rank the applications. I do not believe that this statement is credible because it makes no sense to first assert that there was a different application standard for internal applicants versus external applicants, and

also assert that there was no application standard for internal or external applicants when discussing the same application process.

36.     At the time when they informed EEO of a supposedly different application standard for internal applicants, Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, were either unaware of or did not remember Ms. Klitenic's e-mail direction to me.

37.     However, being aware of or having remembered the email between myself and Ms. Klitenic, Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, when answering the questions asked by the Department of Justice's Investigator in their respective affidavits, each failed to affirmatively reassert the existence of a separate application standard for internal applicants, despite being given multiple opportunities to do so, under penalty of perjury. Ms. Newcomb simply indicated that she assumed Mr. Ridge's transcript and writing sample were on file with NSD, but did not indicate the existence of a separate application standard for internal applicants which differed from the standard contained in the vacancy announcement.

38.     Also, being aware of or having remembered the email between I and Ms. Klitenic, when they were answering the questions asked by the Department of Justice's Investigator in their respective affidavits, neither Ms. Newcomb nor Ms. Gauhar indicated under penalty of perjury, that Ms. Klitenic's direction to the me was made in error.

39.     Although Ms. Newcomb knew that I had worked on FISA Litigation matters with her two immediate predecessors, Scott Glick and Jay Bratt, Ms. Newcomb and Ms. Gauhar told EEO only that I joined the Litigation Section in December 2009. In addition, Ms. Newcomb and Ms. Gauhar are silent as to the full extent of the my FISA Litigation experience in their respective affidavits.

40.     There were only three internal applicants for the Deputy Chief of Litigation position.

41.     Myself, a black male of African-American descent, an internal applicant, who was a full-time member of Litigation Section, who had 3 years of FISA Litigation experience, and whose application was complete in accordance with the vacancy announcement and the direction of the Director of Human Resources. Ms. Newcomb and Ms. Klitenic admit that I'm qualified for the position of Deputy Chief of Litigation.

42.     The second internal applicant, a Caucasian female who had the least legal experience of the three internal applicants and the shortest tenure with the Department of Justice and NSD. This applicant, who worked part-time in the Litigation Section, submitted an application package in compliance with application standard in the vacancy announcement.

43.     Mr. Ridge, the selectee, a Caucasian internal applicant, who was not in the Litigation Section, who had no FISA Litigation experience, and whose application failed to comply with the application standard in the vacancy announcement.

44.     Mr. Ridge's application was nevertheless considered by Ms. Newcomb, who asserted that she believed all of the applications forwarded to her "met all of the qualifications." I do not believe this statement is credible because, according to Ms. Newcomb and Ms. Klitenic, there was no process to screen, rate or rank the applications. Therefore, there is no factual basis to support the conclusion that the applications forwarded to Ms. Newcomb met all of the qualifications.

45.     While in the Litigation Section, I was able to demonstrate my leadership skills. In January 2010, I was able to find a solution a problem concerning the potential disclosure of a sensitive collection technique. Ms. Newcomb decided to leave the office before it was clear that a solution could be found after she determined that OI could not be blamed for the error. Once I found the solution I informed Ms. Newcomb and the Counter-Espionage Section attorney.

46.     In addition, I collaborated with another colleague in the Litigation Section and jointly proposed that OI review all documents containing FISA-derived information before public filing as a prophylactic measure to avoid diclosures like that discussed above.

47.     Also, after Mr. Ridge's selection as Deputy Chief of Litigation, Ms. Newcomb adopted my proposals regarding training of Litigation Section attorneys and commencing negotiations with the FBI regarding OI attorney access to a particular FBI document. Ms. Newcomb scheduled the training and assigned Mr. Ridge to negotiate with the FBI.

48.     Throughout my tenure at OI, between 2006 and 2010, I earned the highest rating in each performance element and the highest possible overall rating in each yearly performance evaluation. However, in my first performance evaluation after the Defendant was notified of my contact with EEO, Mr. Ridge and Ms. Newcomb, without comment, lowered the assessment of my work.

I affirm, under penalty of perjury, that the foregoing statements are true and correct

Joshua W. Nesbitt, *Pro Se*
1629 Tucker Road
Fort Washington, Maryland 20744
(301) 573-3278
joshuawnesbitt@yahoo.com

Sworn before me on this _19_ day of June, 2013

TERESITA MUTTON
NOTARY PUBLIC



IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOSHUA NESBITT<br>1629 Tucker Road<br>Fort Washington, Maryland 20744<br>301-573-3278 | ) ) ) ) ) ) | Civil Action No. 12-717 (RWR) |
|      Plaintiff,<br>v. | ) ) ) |  |
| ERIC H. HOLDER, JR.,<br>Attorney General, United States<br>Department of Justice | ) ) ) ) ) |  |
|      Defendant | ) ) |  |

**PLAINTIFF'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rule 7(h) Plaintiff Joshua Nesbitt hereby submits the following statement of material facts as to which there is no genuine dispute. Unless otherwise indicated, all of Plaintiff's exhibits are contained in the United States Department of Justice, National Security Division's Report of Investigation (ROI). The ROI and a letter which the Defendant sent to EEO in September 2010, which is an attachment to the ROI and cited throughout Plaintiff's Opposition, are admissible for this proceeding and at trial pursuant to Federal Rule of Evidence 801(d)(2)(D) as non-hearsay party admissions by the party's agent or servant concerning a matter within the scope of the agency or employment, and Federal Rule of Evidence 803(8) as public records exceptions to the hearsay rule. English v. District of Columbia, 651 F.3d 1, 7-8 (D.C. Cir 2011).

1.      Plaintiff, a black male of African-American descent, has been employed by Defendant as an attorney since 1992 in the following positions: Assistant U.S. Attorney, Northern District of New York (1992-1999); Trial Attorney, Organized Crime & Racketeering Section in Washington, D.C. (1999-2006); Attorney, Office of Intelligence and its predecessor, the Office of Intelligence Policy & Review (2006-2011); and Trial Attorney, Organized Crime Drug Enforcement Task Force (OCDETF) (2011-present).  **Exhibit A**

2.      When the Plaintiff filed the formal complaint with the Department of Justice Office of Equal Employment Opportunity,  Plaintiff was an Attorney Advisor for the National Security Division (NSD), Office of Intelligence, GS-15, reporting to Ms. Nancy Newcomb (White Female), Chief of Litigation. **Exhibit B, Answers 8-9**

3.      The Office of Intelligence (OI) is divided into three Sections -- Operations, Oversight, and Litigation. The Operations Section is primarily responsible for drafting applications for electronic surveillance and physical searches under the authority of the Foreign Intelligence Surveillance Act (FISA).  **Exhibit C**

4.      The Operations Section is divided into three units. They are the Counterintelligence Unit, the Counterterrorism Unit, and the Special Operations Unit.   Attorneys in the Operations Section appear before the FISA Court in non-adversarial ex parte proceedings held in a sealed courtroom, much like an Assistant U.S. Attorney and federal agent would appear before a United States District Court Judge or Magistrate Judge in a criminal setting when seeking the authority to conduct a wiretap or execute a search warrant.  **Exhibit O, page 2**.

5.      The Oversight Section is primarily responsible with ensuring that the intelligence agencies are in compliance with the law regarding electronic surveillance and physical searches conducted pursuant to FISA or other legal authority. **Exhibit O, page 2.**

6.      The Litigation Section is primarily responsible for working with federal prosecutors who are engaged in espionage and/or terrorism prosecutions, and who want to use FISA-obtained or FISA-derived information in various aspects of the legal proceedings, such as evidence in their direct case, or providing materials which satisfy their Jencks, Brady, or Giglio obligations.  In addition to assessing the litigation risks associated with granting approval to use FISA information, the OI Litigation Section drafts several documents filed under seal for the in camera, ex parte review by the District Court when deciding a defendant's discovery or other motion request which might result in the disclosure of FISA applications, FISA Court orders, or other classified information, the disclosure of which would harm the national security of the United States.  The Litigation Section also handles other matters not associated with FISA Litigation and is the smallest section in OI with, in 2010, a total of six line attorneys, J.N., D.F., R.C, K.T., M.D., and A.M. (four full-time, two part-time), plus the Chief and Deputy Chief. **Exhibit O, page 2**.

7.      In 2009, after Ms. Newcomb's appointment to the position of OI's Litigation Section Chief, she discussed the desire for a Deputy Chief with Deputy Assistant Attorney General Tashina Gauhar.  Together, Joyce Klitenic, the Director of Human Resources, Ms. Newcomb, and Ms. Gauhar, determined the general qualifications and responsibilities for the position of Litigation Section Deputy Chief. **Exhibit B, Answer 11; Exhibit D, Answer 11; Exhibit E, Answers 11 - 15.**

8.      On April 22, 2010, Ms. Newcomb sent an office-wide e-mail to all potential internal applicants indicating the pending announcement regarding "the newly created position of Deputy Chief, Litigation Section, Office of Intelligence."  In the e-mail message, Ms. Newcomb did not indicate that the application standards detailed in the forthcoming announcement were inapplicable to those attorneys already working in OI. Ms. Newcomb's e-mail also did not affirmatively indicate

the existence of a separate application standard for internal applicants which would make the application process less cumbersome.   **Exhibit F (Defendant's Discovery Production)**.

9.     On April 26, 2010, the public announcement for the Deputy Chief position was posted. Despite the description of the duties for the supervisory position which include working with the Section Chief and federal prosecutors in coordinating criminal and civil litigation related to FISA and attending inter-agency meetings, the public announcement indicates that "past experience in the national security or intelligence field is not required," and contains no indication that prior supervisory/management experience is required, desired, or preferred. **Exhibit G**.

10.     The "Department Policies" section indicates that the Department of Justice is an Equal Opportunity/Reasonable Accommodation Employer and goes on to specify its policy against discrimination on many bases, including race. **Exhibit G**.

11.     To apply for the position,  the "Application Process" section directs all applicants to submit a cover letter highlighting their relevant experience, a writing sample, a law school transcript, and a current performance appraisal, if applicable.  The announcement directs applicants to send these materials to Joyce Klitenic. **Exhibit G**.

12.     On April 26, 2010, Plaintiff sent an e-mail inquiry to Ms. Klitenic, asking whether Plaintiff needed to submit a writing sample and transcript, since Plaintiff had been in OI since 2006. Ms. Klitenic replied "**Yes, Please [sic] submit everything that is requested in the vacancy announcement**."(Emphasis added).   **Exhibit H**.

13.     After receiving Ms. Klitenic's response, later that day, Plaintiff sent an e-mail message to Tammy Green, an NSD Human Resources staff member, requesting assistance in acquiring a copy of Plaintiff's law school transcript from his personnel file. **Exhibit I**.

14.     Contrary to Ms. Klitenic's affidavit wherein she stated the Human Resources Office ... would have provided transcripts...upon request to Mr. Nesbitt, and to any other internal applicant, Plaintiff received no response at all to the transcript request at any time prior to Mr. Ridge's selection.  **Exhibit E, Answer 24,**  Plaintiff received no response at all to the transcript request at any time prior to Mr. Ridge's selection.  **Exhibit I.**

15.     On April 27, 2010, Mr. Ridge sent an e-mail message to Litigation Section Chief Nancy Newcomb and Director of Human Resources, Ms. Klitenic, expressing his interest in the Deputy Chief's position and summarizing his qualifications.  Mr. Ridge stated in the e-mail **"My law school transcript should be on file somewhere within the Department and, if necessary, we can discuss what type of writing sample you would like to see in support of my application, although quite honestly, I don't get paid to write."** (Emphasis added).  **Exhibit J.**

16.     Mr. Ridge's e-mail, quite detailed in listing his supervisory experience, the awards that he had earned, and his work before the FISA Court, contains no claim to any experience working with federal prosecutors on FISA Litigation matters pending in the United States District Court. **Exhibit 9.**

17.     At no time prior to Mr. Ridge's selection did Ms. Klitenic direct Mr. Ridge to "Please submit everything that is requested in the vacancy announcement," as she had directed the Plaintiff on the day before Mr. Ridge's e-mail.  It is undisputed that Mr. Ridge did not submit his law school transcript or a writing sample prior to his selection as the Deputy Chief of Litigation.  **Exhibit E, Answer 25**

18.     Plaintiff contacted his law school and acquired his transcript.  While waiting for his transcript to arrive, Plaintiff informed Ms. Newcomb that he intended to apply for the Deputy Chief

position but was awaiting the receipt of his law school transcript.  Ms. Newcomb did not respond. **Exhibit K, page 25**.

19.     On May 14, 2010, Plaintiff submitted a formal cover letter, a writing sample, a law school transcript, and a current performance appraisal to Ms. Klitenic's office, which detailed Plaintiff's 23 years as an attorney, including 14 years as a federal prosecutor, Plaintiff's 4 years in OI and Plaintiff's work on complex FISA Litigation matters in OI from 2007 through 2010.  **Exhibit L;  Exhibit M  - Nesbitt Performance Appraisal Record, June 2009  "Also during this rating period, [Plaintiff] has continued to work on a complex litigation matter, which has required him to take several trips out of the office."**

20.     Before submitting his application, Plaintiff had an informal discussion regarding the Deputy Chief's position with Nancy Newcomb on April 27, 2010.  Ms. Newcomb indicated that she wanted someone who could operate in her place, and someone who could attend meetings that her schedule did not permit.  At no time did Ms. Newcomb inquire of Plaintiff's past "high-level meeting" experience.  **Exhibit K, pages 6 -7**.

21.     On May 20, 2010, Ms. Newcomb conducted the formal interview with the Plaintiff. One of the issues discussed was how Plaintiff would address what Ms. Newcomb described as the "knowledge deficit" amongst the Litigation Section attorneys regarding the Federal Rules of Criminal Procedure and the Classified Information Procedures Act (CIPA).  Plaintiff suggested that someone from NSD's Counter-Terrorism Section or Counter-Espionage Section be asked to give a presentation.  Once again, at no time did Ms. Newcomb inquire of Plaintiff's past "high-level meeting" experience.  **Exhibit K, page 7**.

22.     On May 28, 2010, Ms. Newcomb announced Mr. Ridge's selection as the new Litigation Section Deputy Chief. In the e-mail message, Ms. Newcomb indicated that Mr. Ridge

excelled in Operations and Oversight (an assessment undisputed by the Plaintiff), that he served for four years as a Deputy Chief in the Department of Justice's Capital Case Unit, and served 11 years as an Assistant State's Attorney in Miami. Once again, noticeably absent in Ms. Newcomb's e-mail was any mention of Mr. Ridge's FISA Litigation experience.   **Exhibit N** .

23.     Prior to the formal announcement of Mr. Ridge's selection, Plaintiff was informed of the selection decision by Ms. Newcomb. Ms. Newcomb justified Mr. Ridge's selection to Plaintiff by indicating that Mr. Ridge had litigation and supervisory experience, and knowledge of the FISA Amendments Act (FAA). **Exhibit K, page 7**.

24.     At the same time that Deputy Assistant Attorney General Gauhar approved Mr. Ridge's selection as the Deputy Chief of Litigation, despite his lack of FISA Litigation experience, she also approved the selection of a supervisory attorney from the Operations Section to become the Deputy Chief of the Oversight Section, a section in which Mr. Ridge served with distinction, and where he received several awards for his work from 2008 to 2010. **Exhibit O, page 4, paragraph 2**.

25.     Because of Plaintiff's earlier promotion-related experience in OI from 2009, and the facts stated above, in June 2010, Plaintiff contacted the Department of Justice Office of Equal Employment Opportunity. (EEO) **Exhibit K page 10, Exhibit CC.**

26.     In August 2010, EEO sent questions to the Defendant regarding the application process for the selection of the Deputy Chief of Litigation. Several of the questions requested information regarding what Plaintiff mistakenly believed was the late submission of Mr. Ridges's law school transcript, as opposed to his complete failure to submit one, and any communications between the Defendant and Mr. Ridge regarding the late submission. In addition, EEO posed

questions regarding the nature of Mr. Ridge's writing sample and the bases upon which it was judged superior to the Plaintiff's writing sample. **Exhibit P**.

27.     The Defendant responded to EEO's questions and presented several ostensibly non-discriminatory bases for Mr. Ridge's selection. The letter was written by Ms. Janice Kaye, Of Counsel for the Defendant on the instant motion. However, according to Ms. Kaye, the information contained in the Defendant's letter to EEO was provided by Joyce Klitenic, Nancy Newcomb, and Tashina Gauhar. **Exhibit O, page 1, paragraph 1.**

28.     In response to EEO's questions regarding Mr. Ridge's law school transcript and writing sample, Ms. Klitenic, Ms. Newcomb, and Ms. Gauhar, indicated that "**Although the posting did not differentiate between internal and external candidates, internal candidates did not have to submit a law school transcript, current performance review or writing sample for their application to be considered complete because these materials already were available to NSD staff.**" (Emphasis added). **Exhibit O, page 3, paragraph 2**.

29.     The Defendant's statement to EEO fully contradicts the April 26, 2010, direction from Ms. Klitenic to internal candidate Plaintiff, to comply with the application standard contained in the vacancy announcement. **Exhibit H**.

30.     Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, were either unaware of or did not remember Ms. Klitenic's e-mail direction to internal candidate Plaintiff when they informed EEO of a supposedly different application standard for internal applicants. **Exhibit B, Answer 45; Exhibit D, Answer 44; Exhibit E, Answer 24.**

31.     However, being aware of or having remembered the email between Plaintiff and Ms. Klitenic, Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, when answering the questions asked by the Department of Justice's Investigator in their respective affidavits, each failed to affirmatively reassert

the existence of a separate application standard for internal applicants, despite being given multiple opportunities to do so, under penalty of perjury. **Exhibits B, D, and E.** Ms. Newcomb simply indicated that she assumed Mr. Ridge's transcript and writing sample were on file with NSD, but does not indicate the existence of a separate application standard for internal applicants which differed from the standard contained in the vacancy announcement. **Exhibit B, Answer 25.**

32. Also, being aware of or having remembered the email between Plaintiff and Ms. Klitenic, when they were answering the questions asked by the Department of Justice's Investigator in their respective affidavits, neither Ms. Newcomb nor Ms. Gauhar indicated under penalty of perjury, that Ms. Klitenic's direction to the Plaintiff was made in error. **Exhibit B; Exhibit D**

33. Although Ms. Newcomb was aware that Plaintiff had worked on FISA Litigation matters with her two immediate predecessors, the Defendant told EEO only that Plaintiff joined the Litigation Section in December 2009. **Exhibit L; Exhibit O, page 4, paragraph 1**. In addition, Ms. Newcomb and Ms. Gauhar are silent as to the full extent of the Plaintiff's FISA Litigation experience in their respective affidavits. **Exhibit B, Answers 38, 46; Exhibit D, Answer 40.**

34. There were only three internal applicants for the Deputy Chief of Litigation position. **Exhibit O, page 3, paragraph 2**.

35. Plaintiff, a black male of African-American descent, was an internal applicant, who was a full-time member of Litigation Section, who had 3 years of FISA Litigation experience, and whose application was complete in accordance with the vacancy announcement and the direction of the Director of Human Resources. **Exhibit L**. Defendant admits that Plaintiff is qualified for the position of Deputy Chief of Litigation. **Exhibit B, Answer 19; Exhibit E, Answer 19**.

36. The second internal applicant was a Caucasian female who had the least legal experience of the three internal applicants and the shortest tenure with the Department of Justice and

NSD. This applicant, who worked part-time in the Litigation Section, submitted an application package in compliance with application standard in the vacancy announcement. **Exhibit O, page 3-4; Exhibit X**.

37.     Mr. Ridge, the selectee, was a Caucasian internal applicant, who was not in the Litigation Section, who had no FISA Litigation experience, and whose application failed to comply with the application standard in the vacancy announcement. **Exhibit B, Answer 25; Exhibit O, page 3, paragraphs 3 and 4**.

38.     Mr. Ridge's application was nevertheless considered by Ms. Newcomb, who asserted that she believed all of the applications forwarded to her "met all of the qualifications." **Exhibit B, Answer 23**.

39.     Throughout Plaintiff's tenure at OI, between 2006 and 2010, Plaintiff earned the highest rating in each performance element and the highest possible overall rating in each yearly performance evaluation. **Exhibits M, Y, Z, and AA**. In Plaintiff's first performance evaluation after the Defendant was notified of Plaintiff's contact with EEO, Mr. Ridge and Ms. Newcomb, without comment, lowered the assessment of Plaintiff's work. **Exhibit BB**. (Performance Evaluations were supplied by Defendant's Office of Human Resources)

## DEFENDANT'S STATEMENTS OF MATERIAL FACT
## WHICH PLAINTIFF DISPUTES

40.     Plaintiff disputes the last sentence in paragraph 4 of the Defendant's Statement of Material Facts. The statement, referring to Ms. Newcomb, reads "She presumed that all of the applications provided to her for review met the applicable standard." There is no doubt that this is what Ms. Newcomb said, but Plaintiff challenges whether what was said by Ms. Newcomb is factual

for the following reason:  In response to Question 20 of her affidavit, Ms. Newcomb indicates "I am unaware of any process to screen, rate, or rank the applicant's packages.  I was informed that NSD's Human Resources Office gave me all of the application packages without any apparent sorting or categorization." **Exhibit B.**   Knowing that no review of the application packages was conducted before Ms. Newcomb received them, Plaintiff challenges whether Ms. Newcomb, in fact,  presumed anything regarding whether the packages "met all of the qualifications" at the time of receipt.  By Ms. Newcomb's own admission, there was no factual support for such a presumption, as she had knowledge of evidence to the contrary.

41.     Plaintiff disputes the second clause of paragraph 10 as mischaracterizing the statement Plaintiff made to the Department of Justice Investigator in his affidavit.  Plaintiff was asked " Why do you believe you are better qualified than the selectee?   Plaintiff responded in part..."My involvement with [FISA] Litigation since 2007, and being a member of the Unit since December of '09, already doing the work of the section and working closely with the Chief of the Litigation Section, I believe that I was the best qualified.  And, you know, I admit that one could quibble over what experience is best...and that's a judgement call...but now knowing the facts...that Mr. Ridge did not even submit a complete application, I think that that left me as the most qualified person with a completed application, was already in the Litigation Section, and had a ton of litigation experience, I should be selected." **Exhibit K, page 22 - 23.**

42.     Plaintiff submits that the plain meaning of the full statement is clear, that if Mr. Ridge had submitted a complete application, then one, i.e. a fair-minded person, could quibble regarding whether his management experience or Plaintiff's FISA and federal litigation experience is best suited for the position of Deputy Chief of Litigation.  But, as the Defendant admits, Mr. Ridge did not submit an application in compliance with the application standard in the vacancy

announcement.   Therefore, despite Defendant's efforts to mischaracterize Plaintiff's statement,

Plaintiff did not state or imply that the Defendant's promotion decision was simply a judgment call

in choosing between well qualified applicants.

I affirm, under penalty of perjury, that the foregoing factual statements are true and correct

Joshua W. Nesbitt, *Pro Se*
1629 Tucker Road
Fort Washington, Maryland 20744
(301) 573-3278
joshuawnesbitt@yahoo.com

Sworn before me on this ___ day of June, 2013

TERESITA MUTTON
NOTARY PUBLIC

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA NESBITT<br>1629 Tucker Road<br>Fort Washington, Maryland 20744<br>301-573-3278<br><br>     Plaintiff,<br>v.<br><br>ERIC H. HOLDER, JR.,<br>Attorney General, United States<br>Department of Justice<br><br>     Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 12-717 (RWR) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiff, Joshua Nesbitt, *pro se*, hereby respectfully submits this Supplemental Memorandum

of Points and Authorities in opposition to the Defendant's Motion for Summary Judgment.

### STATEMENT OF THE CASE

1.     On or about April 26, 2010, the Department of Justice (DOJ), National Security

Division (NSD) (the Defendant), posted an announcement for the position of Deputy Chief of

Litigation in the Office of Intelligence. **Exhibit G**.  On May 14, 2010,  Plaintiff applied for the

position by submitting a formal cover letter, a writing sample, a law school transcript, and a current

performance appraisal to the Director of Human Resources. **Exhibit L**.  On May 28, 2010, Litigation

Section Chief Nancy Newcomb announced the selection of Paul Ridge as the new Deputy Chief of

Litigation. **Exhibit N.** On or about June 11, 2010, Joshua W. Nesbitt (Plaintiff) contacted the DOJ's Equal Employment Opportunity Office (EEO). **Exhibit K page 10.**

2.      In August 2010, EEO sent a list of questions to the Defendant regarding the selection of Mr. Ridge **Exhibit P.** In a letter dated September 2, 2010, NSD responded to EEO's questions in a four-page letter. **Exhibit O.** On October 5, 2010, Plaintiff filed a Complaint of Discrimination with the Defendant alleging that the denial of promotion to the position of Deputy Chief of Litigation was the result of race-based (African- American) discrimination. **Exhibit Q**.

3.      On December 29, 2010, Plaintiff provided an affidavit regarding the Complaint via an in-person recorded interview with the EEO Investigator. **Exhibit K.**   In February 2011, the Defendant's officials Nancy Newcomb, Tashina Gauhar, and Joyce Klitenic, provided written affidavits to the EEO Investigator.  **Exhibit B, Exhibit D, Exhibit E**.

4.      Plaintiff commenced the present action by filing a Complaint in United States District Court on May 3, 2011, alleging discrimination based on race in the Defendant's denial of Plaintiff's promotion to the position of Deputy Chief of Litigation in the Office of Intelligence (OI). **Exhibit A**.

5.      On May 13, 2013, the Defendant filed the present Renewed Motion For Summary Judgment.

6.      On May 30, 2013, Plaintiff filed his submissions in Opposition to Defendant's Renewd Motion For Summary Judgment.

7.      On June 7, 2013, the Court issued an Order which granted Plaintiff leave to supplement his opposition submissions.

## STATEMENT OF FACTS

1.      The Plaintiff adopts as his Statement of Facts, the Plaintiff's Supplemental Statement Of Material Facts As To Which There Is No Genuine Dispute, appended hereto.

## MEMORANDUM OF LAW

**I.      LEGAL STANDARDS**

**A.      Discrimination Based Upon Race**

1.      Under Title 42, United States Code §§ 2000e-2 *et seq*. (Title VII), it is an unlawful employment practice for an employer to discriminate against any individual with respect to his conditions, or privileges of employment because of that individual's race. Evans v. District of Columbia, 754 F. Supp.2d. 30 (D.D.C. 2010). "The two essential elements of a discrimination claim under this section are that (I) plaintiff suffered an adverse employment action, (II) because of plaintiff's [race]." Evans, 754 F.Supp.2d at 43.

**B.      Adverse Employment Action**

2.      A "plaintiff bears the burden of showing a tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities." Stewart v. Ashcroft, 352 F.3d 422,426 (D.C. Cir. 2004). "A plaintiff who is ...denied a lateral transfer - that is, one in which [he] suffers no diminution in pay or benefits - does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions or privileges of [his] employment or [his] future employment opportunities, such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." Stewart, 352 F.3d at 426.

3.      In the instant case, the Deputy Chief of Litigation supervises and directs six attorneys (some full-time and some part-time) in relation to FISA Litigation filings in the United States

District Court, and according to Deputy Assistant Attorney General Gauhar, also represents the Litigation Section in numerous high-level meetings relating to national security matters with the FBI and other agencies of the Intelligence Community. **Exhibit D, Answer 35.** The Deputy Chief of Litigation also fulfills the Chief's management and other duties in the Chief's absence. **Exhibit D, Answer 34**. Therefore, non-selection as the OI Deputy Chief of Litigation "has objective, tangible, and materially adverse consequences for the terms. conditions and privileges of [Plaintiff's] employment because [the Defendant] has denied him the opportunity to advance within the hierarchy of [OI] and [the Department of Justice] more generally." Stewart, 352 F.3d at 426.

C.    **Adverse Employment Action Suffered Because of Discrimination**

4.    Where the plaintiff has no direct evidence that the adverse employment action was caused by prohibited discrimination, federal courts have analyzed discrimination claims under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell framework, the plaintiff must establish a prima facie case of discrimination. "To establish a prima facie case of discriminatory non-promotion, the plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) someone [not of Plaintiff's class] filled the position." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C.Cir. 2003); Machakos v. Meese, 647 F.Supp. 1253, 1262 (D.D.C. 1986). In the instant case: (1) Plaintiff is African-American; (2) Plaintiff applied for the position and, as conceded by Ms. Newcomb and Ms. Klitenic, Plaintiff is qualified to be the Deputy Chief of Litigation. **Exhibit B, Answer 19; Exhibit E, Answer 19**; (3) Plaintiff was not selected; and (4) Mr. Ridge (Caucasian) was selected, despite his lack of FISA Litigation experience and his submission of an incomplete application.

5.      However, in Title VII disparate treatment cases, "where the employee has suffered an adverse employment action, and the employer has asserted non-discriminatory reasons for the promotion decision, the district court need not and should not decide whether the employee actually made out a prima facie case under McDonnell Douglas.  "Rather, in considering the employer's motion for summary judgment as a matter of law...the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reasons was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race..." Brady v. Office of the Sergeant At Arms, 520 F.3d 490, 494, (D.C. Cir. 2008).

**D.     SUMMARY JUDGMENT**

6.      Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.56(a).   The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (1986).  A fact is only material if it is capable of affecting the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986).

7.      To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. at 2553.  Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is

such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. at 2510.

8.      If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  Moore v. Harman, 571 F.3d 62, 66 (D.C. Cir. 2009).

9.      When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in the non-movant's favor. Anderson v. Liberty Lobby, Inc., 106 S.Ct. at 2513.  The court must consider whether the jury could infer discrimination from all of the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation; and (3) any further evidence of discrimination that may be available to the plaintiff. Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998); Boone v. Clinton, 675 F.Supp.2d 137, 143 (D.D.C. 2009). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment.  Aka v. Washington Hospital Center, 156 F.3d at 1289.  Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case.  Aka v. Washington Hospital Center, 156 F.3d at 1291.

10.      "Pretext may be established directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Boone v. Clinton, 675 F.Supp.2d at 144.  "However, it is insufficient to simply show that a reason given for a job action is not just, or fair, or sensible; instead, the plaintiff must establish that the explanation given is a phony reason."  Id.

II.     THE DEFENDANT'S APPLICATION PROCESS WAS CORRUPTED FOR THE
        PURPOSE OF EFFECTUATING RACE-BASED DISCRIMINATION AND THE
        DEFENDANT'S ASSERTED NON-DISCRIMINATORY REASONS FOR THE
        DENIAL OF PROMOTION ARE PRETEXTS FOR RACE-BASED
        DISCRIMINATION

A.      The Application Process

I.      Ms. Newcomb and Ms. Gauhar Falsely Asserted To EEO That The Application
        Requirements For Internal And External Applicants Differed From That Contained In
        the Vacancy Announcement

        11.     "Proof that the defendant's explanation is unworthy of credence is simply one form
of circumstantial evidence that is probative of intentional discrimination, and may be quite persuasive.
Proving the employer's reason false becomes part of and often considerably assists the greater
enterprise of proving that the real reason was intentional discrimination.    In appropriate
circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the
employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with
**the general principle of evidence law that the fact-finder is entitled to consider a party's
dishonesty about a material fact as affirmative evidence of guilt.**" Reeves v. Sanderson, 530 U.S.
133, 147 (2000).  (Emphasis added).

        12.     The information provided by Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, to the
EEO indicated that "**internal candidates did not have to submit a law school transcript, current
performance review or writing sample for their application to be considered complete because
these materials already were available to the Defendant staff. Exhibit O, page 3, paragraph 2.**
(Emphasis added).    There can be no doubt that the requirements for a candidate's application to be
considered complete is a "material fact" in a disparate treatment context. Had the Defendant applied
the application standard in the vacancy announcement, Mr. Ridge would have been disqualified for

promotion consideration.  In addition, in light of Ms. Klitenic's April 26, 2010, direction to internal

candidate Plaintiff to submit everything that is requested  in the vacancy announcement, **Exhibit H**,

there is also no doubt that Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic made a deliberately false

assertion to EEO about that material fact.

13.     There are several observations Plaintiff makes about this false assertion.  The false

assertion was made because Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic never knew or did not

remember that Plaintiff had made a written inquiry and received a written response from Ms. Klitenic.

According to Ms. Klitenic's affidavit, **"I do not recall Mr. Nesbitt's inquiry..."** **Exhibit E,**

**Answer 24.**     According to Ms. Gauhar's affidavit**, "I have no first-hand knowledge of**

**communications between Mr. Nesbitt and Ms. Klitenic. I found out about this only after Mr.**

**Nesbitt told certain members of [The Defendant's] management...during the course of these**

**proceedings." Exhibit D, Answer 44**.  According to Ms. Newcomb's affidavit, **"I have no first-**

**hand knowledge of communications between Mr. Nesbitt and Ms. Klitenic." Exhibit B,**

**Answer 45**.  Plaintiff submits that Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic would never have

made that particular false assertion to EEO if they knew or remembered that the false assertion could

be immediately disproved.

14.     In addition, in the Defendant's Answer to Plaintiff's Complaint, the Defendant states

as follows: "Defendant avers that NSD's Human Resources Office filled more than 80 positions in

2010 and staff cannot recall every conversation with every applicant. **Exhibit R, Answer 17**.

15.     Plaintiff submits that the Defendant had only to remember one fact, that is, which

application standard was applicable to internal applicants, either the one in the vacancy announcement

or some other standard.  Defendant did not have to remember with whom the Defendant spoke or

where the conversation took place.  Defendant only had to repeat the one fact, the one truth, however many times, in whatever circumstance.

16.     Also, not only did Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic make a false assertion to EEO, but they also made the same false assertion to the Defendant's representatives before the EEO.  Ms. Kaye,  Of Counsel on the instant motion, and Mr. Donald Vieira, the then-AAG's Chief of Staff, were caught off guard when the Plaintiff presented them with written proof of Ms. Klitenic's direction to the Plaintiff to submit everything that was requested in the vacancy announcement.  After a break in the proceeding, Ms. Kaye and Mr. Vieira returned to tell the Plaintiff that the Defendant just forgot to tell the Plaintiff of the different application requirements for internal candidates. **Exhibit K, page 25**.

17.     If Ms. Kaye's and Mr. Vieira's statement was meant to imply that the Defendant simply forgot to notify only the Plaintiff of the different application standard before the application deadline, that statement is incredible.  As noted in the Plaintiff's Statement Of Material Facts, Ms. Newcomb's e-mail to the universe of internal applicants contained no mention of a more lenient application standard for internal applicants. **Exhibit F.**  In addition, the second internal applicant submitted an application package in compliance with the requirements in the vacancy announcement, which included a cover letter, law school transcript, and a writing sample. **Exhibit X**.  There's no evidence in the ROI, and the Defendant has not produced evidence in discovery, that supports the notion that Ms. Newcomb told anyone of a different application standard for internal applicants at any time prior to the Plaintiff's challenge to Mr. Ridge's selection.

18.     If Ms. Kaye's and Mr. Vieira's statement implied that the Defendant forgot to tell the Plaintiff that the application standard was changed at sometime after the closing date, then their

statement is likely true, as there would be no benefit to the Plaintiff in acquiring such knowledge after Plaintiff had already submitted a complete application package.   **Exhibit K, page 26**.

19.    Further undermining the Defendant's claim of a different application standard for internal applicants, is Ms. Klitenic's response to Question 24 in her affidavit. Ms. Klitenic indicates that "the Human Resources Office...would have provided transcripts and other documents upon request ...to any other internal applicant..." **Exhibit E, Answer 24**

20.    First, Ms. Klitenic's statement is consistent with her direction to internal applicant Plaintiff, and demonstrates that the standard in the vacancy announcement was applicable to internal applicants.  Secondly, in the current context wherein Ms. Klitenic is providing an affidavit in relation to an employment discrimination claim in which the Plaintiff alleges that the Selectee's application was incomplete, and the Defendant counters by indicating that internal applicants did not need to comply with the application standard in the vacancy announcement, it defies logic for Ms. Klitenic to assert that she would have  provided to internal applicants, documents which the Defendant claims the internal applicants did not need for their applications to be considered complete.  **Exhibit E, Answer 24; Exhibit O**.

21.    Moreover, please note that after the false assertion had been disproved by Ms. Klitenic's email, Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic made no mention of a different application standard for "internal candidates versus external candidates" in their respective affidavits, under penalty of perjury.  Furthermore, neither Ms. Newcomb nor Ms. Gauhar indicate in their affidavits that Ms. Klitenic's direction to the internal applicant Plaintiff was in error.  **Exhibit B, Exhibit D, Exhibit E** .

22.    In addition to the falsely asserted different application requirements for internal and external candidates, Ms. Newcomb and Ms. Klitenic offered a different and markedly less credible

explanation for their actions in the selection of the Deputy Chief of Litigation, by asserting that all application standards were abandoned for everyone in the selection process.  Ms. Klitenic, the Director of Human Resources, previously quite clear regarding the need to submit "everything that is requested in the vacancy announcement," **did not screen, rate, or rank the applications**," and simply **"collected the applications and forwarded them to Ms. Newcomb." Exhibit E, Answers 20 and 21.**  And according to Ms. Newcomb, who since 2009, collaborated with Ms. Klitenic and Ms. Gauhar in the creation of the position and application requirements, **"I am unaware of any process to screen, rate, or rank the applicants' packages...The Human Resources Office gave me all of the application packages without any apparent sorting or categorization," Exhibit B, Answer 20, and "The presence or absence of any particular piece of the application package had no bearing...in the selection process."  Exhibit B, Answer 23**.    These comments were made in relation to **all** the application packages, not just the internal applicants' packages.

23.    In order to credit Ms. Klitenic's and Ms. Newcomb's statements that there was no process to screen, rate, or rank any of the applicant packages, and that no application standards were applied to internal or external applicants, the trier of fact would have to find that Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, since 2009, worked together to consider the duties and responsibilities of the prospective Deputy Chief of Litigation, including when and how to apply, and after sober reflection, decided on what materials would most likely identify the ideal candidate, whether internal or external.  And once the public announcement was made in 2010, they reversed themselves and completely abandoned the process so carefully developed, in the total absence of some seminal event. **See Exhibit B, Answer 11; Exhibit D, Answer 11; Exhibit E, Answers 11 - 15**

24.    Also, if there was, in fact, no application standard applied to any applicants, internal or external, then when responding to EEO's questions related to Mr. Ridge's transcript and writing

sample, which were posed well after the selection process was over, there was no need for Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic to distinguish the application standard for the internal applicants versus external applicants. They only needed to say that the announced application standards were abandoned for everyone.

25.    Ms. Klitenic's direction to the Plaintiff and willingness to assist other internal applicants to acquire the documents for the application submissions supports the conclusion that there was only one application standard, the one contained in the vacancy announcement, the standard with which Mr. Ridge did not comply. The Defendant has issued a series of false assertions, with no corroboration in the record, made only after Plaintiff challenged Mr. Ridge's selection. But it is these false assertions which the Defendant uses to justify promotion consideration of Mr. Ridge's incomplete application, the result of which was to deny promotion to the most qualified candidate with a complete application, the African-American applicant.

26.    The Defendant's statements in this regard are inconsistent and contradictory. On these facts, a reasonable jury could find that only one application standard was in existence and that based on the inconsistent and contradictory nature of the Defendant's post-hoc false assertions, that the false assertions were offered to mask the truth about the application process. A reasonable jury could then conclude that the decision to consider Mr. Ridge's incomplete application and promote Mr. Ridge was the product of race-based discrimination. "The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext." Dennis v. Columbia Colleton Medical Center, Inc., 290 F.3d 639, 646 (4th Cir. 2002).

## II.    Mr. Ridge's Incomplete Application

27.    In Machakos v. Meese, 647 F.Supp. 1253 (D.D.C. 1986), in its unsuccessful defense of a reverse-discrimination claim based upon a series of promotion denials, the Department of Justice

offered evidence to show that in one instance, Ms. Machakos had submitted an incomplete application packet, and the Court acknowledged that every denial of promotion in that case was not for an improper reason. Machakos, 647 F.Supp. at 1263.

28.    In   Hamilton v. Geithner, 616 F.Supp.2d 49 (D.D.C. 2009), when Hamilton complained that the selectee did not submit a complete application until after the application deadline had passed, the Court noted that  "...**even assuming that [the selectee's] application should have been deemed "incomplete" due to the lack of the current performance appraisal...and therefore rejected for consideration, there is no evidence in the record that the...selecting official, knew of the discrepancy**." Hamilton v. Geithner, 616 F.Supp.2d at 58 (Emphasis added).

29.    In the instant case, Ms. Newcomb reviewed the applications and knew Mr. Ridge's application was incomplete.  Ms. Newcomb admits "The presence or absence of any particular piece of the application package had no bearing...in the selection process." **Exhibit B, Answer 23**. Despite the requirements of the announcement which were selectively enforced as to Plaintiff, Ms. Newcomb retained Mr. Ridge's application for consideration and eventual promotion.  The Court in Machakos stated, "The Court notes with interest, the Departments rigid adherence to ...application requirements in this instance, while willing to be more accommodating in other cases to black applicants." Machakos, 647 F.Supp. at 1259.  The Machakos court points to the same dynamic evident in the instant case where: (a) the Defendant required the Plaintiff's rigid adherence to the application requirements, and (b) the Defendant was far more accommodating to a non-minority applicant to whom no such application standards were applied.  As both Machakos v. Meese and Hamilton v. Geithner suggests, Mr Ridge's application should have been deemed incomplete and rejected for consideration.

## III.   <u>Violations of Protocol</u>

30.   "A violation of protocol may be probative of the employer's true motivation if (1) the violation is suspicious, in and of itself, (2) the agency "inexplicably departed" from its normal procedures, or (3) the violation inherently raises credibility questions." <u>Perry v. Shinseki</u>, 783 F.Supp.2d 125, 139 (D.D.C. 2011).  In the instant case, the Defendant's true motivation for choosing Mr. Ridge over the Plaintiff is evident, as all three violations of protocol are met : (a) the violation is suspicious - There is no logic in departing from a process carefully and collectively agreed upon over several months at the moment it is to be implemented; **See Exhibit B, Answer 11; Exhibit D, Answer 11; Exhibit E, Answers 11 - 15;**  (b) the agency "inexplicably departed" - Apart from the false assertions discussed above, the Defendant offers no explanation for its departure from the stated application process for all applicants; and (c) the violation inherently raises credibility questions - the Defendant made false assertions about the application standards for internal versus external applicants and simultaneously offered a contradictory explanation.  See also  <u>Turner v. Baylor Richardson Medical Center</u>, 476 F.3d 337,346 (5th Cir. 2007) ( "Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.");   <u>Stern v. Trustees of Columbia University in City of New York</u>, 131 F.3d 305, 313 (2nd Cir. 1997) ("While we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII, and departures from procedural regularity, for example, can raise a question as to the good faith of the process where the departure may reasonably affect the decision."); <u>Kinsey v. First Regional Securities, Inc.</u>, 557 F.2d 830 837 (D.C. Cir. 1977) ("As exhibited here, such non-uniform and unequal application of criteria by an employer constitutes an unfair employment practice").

31.    In <u>Fields v. Johanns</u>, 574 F.Supp.2d 159 (D.D.C. 2008), Fields, a black female, was denied promotion to two Administrative Management Services (AMS) positions with the United States Department of Agriculture (USDA), for which two white males were selected. 574 F.Supp.2d at 160-161. Fields claimed that USDA discriminated against her, asserting that she was not selected for either position because of her race and gender. Id. at 160-161. Fields also claimed that one of the white male selectees (Nagel) was preselected in violation of USDA regulations. Id at 163-164. USDA moved the Court for summary judgment. Id. at 160.

32.    Fields provided evidence in support of her preselection claim. Id at 163-164. In support of her claim that her interviews for the AMS positions did not comport with the USDA regulations, Fields asserted that the violation occurred because an EEO representative was not present. Id. at 164. USDA countered that the regulations cited by Fields did not apply at the time of Fields' interview. Id. The Court, in denying USDA's motion for summary judgment, held as follows:

> There is a factual dispute between the parties as to which set of regulations applied at the time of Fields' application. This factual dispute is material because failure to follow established procedures may demonstrate pretext. Thus a reasonable jury might find that USDA failed to follow its own procedures...And...a reasonable jury might also find that the USDA violated regulations by preselecting Nagle. Taken together, there is sufficient evidence whereby a jury might find that Fields was subjected to discrimination on the basis of her race and gender."

Id. at164.

33.    Plaintiff submits that based on the facts of this case and in the context of the Defendant's inconsistent and contradictory statements, the trier of fact could reasonably conclude that Ms. Newcomb and Ms. Gauhar determined that if they followed the rules which they had established for the selection of the Deputy Chief of Litigation, they would have had no choice but to select the Plaintiff, the most qualified applicant with a complete application, an applicant who was in the

Litigation Section, an applicant with three years FISA Litigation experience, and an African-American.

34.     However, Plaintiff's race proved to be the seminal event which motivated Ms. Newcomb's and Ms. Gauhar's abandonment of the application standard and the consideration of Mr. Ridge's incomplete application. Thus, Ms. Newcomb and Ms. Gauhar, in order to avoid promoting an African-American into management, instead promoted Mr. Ridge, a Caucasian, who was not in the Litigation Section, who had no FISA Litigation experience, and who had submitted an incomplete application.

35.     Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic then made false assertions to EEO about the selection process in an attempt to hide the truth about their actions. But their efforts were exposed by the Plaintiff's production of Ms. Klitenic's e-mail to Plaintiff, an e-mail record which Ms. Newcomb and Ms. Gauhar did not know existed when they made the false assertions. Taken together, the Defendant's failure to follow the application procedures it voluntarily put into place and it's false assertions regarding which procedures were in effect, present sufficient evidence by which a jury might find that Plaintiff was subjected to discrimination on the basis of race.

36.     Therefore, in accordance with the facts and the law as stated above, Plaintiff submits that summary judgment is precluded because the trier of fact must determine (1) whether there was, in fact, a different application standard for internal applicants which permitted the consideration of Mr. Ridge's application or whether that assertion by the Defendant was in fact a false explanation, solely designed to mask a promotion decision which was the product of race-based discrimination; and (2) whether the Defendant, who admittedly deviated from the objective application standard in the vacancy announcement, a standard confirmed by Defendant's own Director of Human Resources,

did so for the purpose effectuating a promotion decision which was the product of race-based discrimination.

**B.     The Defendant's Asserted Non-Discriminatory Reasons**

37.     In Colbert v. Tapella, 649 F.3d 756 (D.C. Cir. 2011), Colbert, an African-American woman, was not promoted to either of two available openings within the Government Printing Office, positions which were eventually awarded to two Caucasian males. Colbert, 649 F.3d at 757.  Colbert sued under Title VII alleging race and gender discrimination.  Id.  The District Court granted summary judgment for the defendant.  In the course of reversing the District Court, and ruling that a reasonable jury could find in Colbert's favor, the Court of Appeals noted the following: "the district court, relying on Adeyemi v. District of Columbia, 525 F.3d 1222, 1227 (D.C. Cir. 2008), found that nothing Ms. Colbert offers...sufficient to show that she was significantly better qualified than [the selectees].  Adeyemi held, when an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, the plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was significantly better qualified for the job than those ultimately chosen...The qualifications gap must be great enough to be inherently indicative of discrimination.  **But Adeyemi is not controlling here because Colbert is not using her comparative qualifications to prove discrimination.  Rather, Colbert uses her qualifications to show this is not the exceptional case in which the record conclusively revealed some other non-discriminatory reason.**" (Emphasis added)  Colbert, 649 F.3d at 760.

38.     Plaintiff in the instant case occupies the same position as Ms. Colbert, using his qualifications to show that, in this case, the record does not conclusively reveal some other non-discriminatory reason supporting the denial of promotion decision.  In Plaintiff's Affidavit, in response to the Defendant's Investigator's question "Why do you believe that you were discriminated

against on the basis of your race when you were not selected," Plaintiff responded, in part "...Certainly it wasn't on the basis of my lack of experience. It certainly wasn't on the basis of my lack of time in the Office of Intelligence. Certainly it wasn't on the basis of my lack of experience with [FISA] litigation... its res ipsa loquitur. How does this happen in the absence of discrimination based on race? It doesn't," and "...one could quibble over what experience is best...that's a judgment call...but now knowing the facts...,that Mr. Ridge did not even submit a complete application, I think that left me as the most qualified person with a completed application..." **Exhibit K, pages 11 and 23**.

39.     Therefore, the question before this Court is not whether a reasonable jury could find that Plaintiff has established a qualifications gap between himself and Mr. Ridge sufficient to prove discrimination in the promotion decision, but rather, whether the a reasonable jury could find on the facts presented, that Plaintiff's qualifications are such that the record does not conclusively demonstrate some legitimate non-discriminatory reason for the Defendant's promotion decision. For the reasons discussed below, Plaintiff submits that the record fails to demonstrate a legitimate non-discriminatory reason for the Defendant's promotion decision.

## I.     <u>Management/Supervisory Experience</u>

40.     "We do not say that [the employer-witness'] emphasis on management experience to the exclusion of other job criteria listed in the posted job description was alone probative of pretext. It is the fact that [the employer's] proffered explanation for promoting [the selectee] over [the plaintiff] exhibited inconsistencies is probative." "...we also recognize the reality that an employer asked to justify its actions after the fact has an incentive to claim that the "real" criteria were those on which the chosen employee happens to perform best relative to the plaintiff. When an employer picks one of a list of posted job qualifications and claims that it was actually decisive without regard to the others, the jury is certainly permitted to conclude, in light of the totality of the evidence, that

this may have been done as a post hoc justification of a decision made on other grounds." <u>Dennis v. Columbia Colleton Medical Center, Inc.</u>, 290 F.3d 639, 646 (4th Cir. 2002).

41.      The <u>Dennis</u> court tells us two things: (a) All of Ms. Newcomb's and Ms. Gauhar's asserted non-discriminatory justifications for Mr. Ridge's selection must be examined in the context of the false assertions made by Ms. Newcomb, Ms. Gauhar, and Ms. Klitenic, and in the context of the inconsistencies exhibited in their varied explanations of the selection process; and (b) that both before and after the false assertion was exposed, Ms. Newcomb and Ms. Gauhar had an incentive to state that they valued Mr. Ridge's specific experience over that of the Plaintiff.  Plaintiff will address below why those stated valuations are pretextual.

42.      Ms. Newcomb and Ms. Gauhar indicated that the ideal candidate would possess management/supervisory experience and that this was a significant factor in Mr. Ridge's selection. Not only is there no mention of the requirement or the desire or the preference for applicants to have management/supervisory experience in the announcement for the position, in the instant case, management/supervisory experience didn't become "essential" until after the Defendant's promotion decision was challenged by the Plaintiff.    Then, for the first time was it so described "...management/leadership experience suggesting the ability to participate effectively in high-level meetings was essential...". **Exhibit O, page 3, paragraph 1**.

43.      In <u>Stewart v. Ashcroft</u>, 352 F.3d 422 (D.C. Cir. 2003), an African-American attorney appealed the District Court's decision granting summary judgment to the Department of Justice in a denial of promotion case.  Stewart had complained of race-based discrimination when a non-minority attorney with less litigation experience, but more managerial experience, was selected to head the Environmental Crimes Section (ECS). <u>Stewart</u>, 352 F.3d at 423- 424.  In affirming the District Court's decision, the Court noted "The Government takes the position that while litigation

experienced is required, management experience is the most critical.  Specifically, DOJ required the Chief to have: experience in managing complex organizations, creating training programs, establishing and prioritizing enforcement initiatives, and developing ECS policy.  It is clear [the selectee] had these skills and Stewart lacked them." Stewart, 352 F.3d at 430.

44.    In the instant case, as noted above and contrary to Stewart, if prior management/supervisory experience was "essential," the public announcement would have so indicated or specified that such experience was required, desired or preferred as in Stewart.  Failing to describe an "essential" skill in a recruitment effort makes no sense because frankly, it makes no sense to encourage a wide range of unqualified applicants to apply.

45.    If one were to juxtapose the Defendant's assertion regarding the application standard which was abandoned for all applicants with the Defendant's characterization of the essential nature of management/supervisory experience for the successful applicant, one would be forced to conclude that the Defendant's actions relative to the vacancy announcement were irrational.  The Defendant's vacancy announcement required the submission of items which were unnecessary for the application to be considered complete, but was silent regarding an essential skill that the Defendant sought in the successful applicant.

46.    In addition, Ms. Newcomb and Ms. Gauhar never mention the size of the Litigation Section in relation to the management challenges presented.  There's a reason for their silence.

47.    At the time of Mr. Ridge's selection, the Litigation Section had only 4 full-time and 2 part-time attorneys. Suggesting that prior management experience is required in assigning matters to and editing the work product of 6 people, with the assistance of a second supervisor (the Chief), would be a stretch, and would seriously undermine the Defendant's argument regarding the essential need for such experience.

48.     Plaintiff's position is further supported by Ms. Newcomb's statement to EEO. There Ms. Newcomb indicated that **"management/leadership experience suggesting the ability to participate effectively in high-level meetings was essential..."** Ms. Newcomb's statement is a tacit admission that the management of the Litigation Section poses no significant challenge requiring prior management experience.   The Defendant's position regarding management/supervisory experience is illustrative of the post hoc justification that the Dennis court described.

## II.     FISA Litigation Experience

49.     Ms. Newcomb and Ms. Gauhar, although aware of Plaintiff's FISA Litigation experience prior to joining the Litigation Section in December 2009, fail to mention the full length Plaintiff's FISA Litigation experience in the letter to EEO,  **Exhibit O, page 4, paragraph 1**,  and are silent on the subject in their affidavits.   However, Plaintiff's work on complex FISA Litigation is evident in the record -"**Also during this rating period, [Plaintiff] has continued to work on a complex litigation matter, which has required him to take several trips out of the office,**" and in the August 14, 2009, e-mail between Plaintiff and Lisa Farabee: "Plaintiff: Thank you for the very positive performance evaluation" Farabee: "**...Nancy [Newcomb] sang your praises as well on your lit assignment.**"**Exhibit M** ; **Exhibit L**.   "This raises a factual issue about whether [Ms. Newcomb and Ms. Gauhar], who relied on [Plaintiff's] lack of qualifications to justify their decision not to promote [him], did not accurately characterize [Plaintiff's] past work experience.   It could also undermine the credibility of their neutral justification for not promoting [Plaintiff] and could raise the specter that it was pretextual." Boone v. Clinton, 675 F.Supp.2d at 147.

50.     In contrast to the Defendant's position on management experience, Ms. Newcomb and Ms. Gauhar dismissed the need for Plaintiff's strength, substantive FISA Litigation experience, in managing the Section.  According to Ms. Newcomb and Ms. Gauhar, Ms. Newcomb was willing to

consider candidates "...who would require training and education about the FISA-specific aspects of the Litigation Section's work. **Exhibit O, page 3, paragraph 1; Exhibit D, Answer 15**.

51.    In <u>Downing v. Tapella</u>, 729 F.Supp.2d 88, 96 (D..D.C. 2010), the Court considered post-selection evidence to demonstrate that the employer's asserted non-discriminatory explanation had been valid.  In the instant case, it is not clear that Ms. Newcomb provided any training or education about the FISA-specific aspects of the Litigation's Section's work to Mr. Ridge, which was evidenced , upon information and belief, by Mr. Ridge's approval, in Ms. Newcomb's absence, of the Government's opposition papers in the case of  <u>United States v. Robert  J. Cabelly</u>, 09-278 (JDB).

52.    In FISA Litigation, OI attorneys draft the documents which are filed in United States District Court, but the OI attorneys do not sign them.  There is no "Of Counsel" or "On the Brief" designation which identifies the attorney in OI who actually prepared the documents.  Assistant U.S. Attorneys sign the OI-drafted opposition motions trusting in OI's expertise.  In <u>Cabelly</u>, that trust was misplaced.

53.    The Court's decision, written by Judge Bates, begins at the second paragraph by noting "At the outset, it is important to confirm what defendant's motion does <u>not</u> seek." (Emphasis in the original).  The Court then proceeds to list 5 superfluous items addressed in the Assistant U.S. Attorney's opposition which were not part of the defendant's request, and that were "largely beside the point..." They are (1) the constitutionality of FISA's probable cause standard; (2) the constitutionality of FISA's ex parte review procedure; (3) the suppression of any evidence; (4) the need for a hearing under <u>Franks v. Delaware</u>...on the ground that the FISA applications are based on false information; and (5) " the motion does seek material that would compromise the national security, such as methods, means, and facilities which the government intercepted."  The certified copy of the <u>Cabelly</u> decision attached hereto as **Exhibit S**, was filed after an Assistant U.S. Attorney

in the District of Columbia's U.S. Attorney's Office signed the Ridge-approved motion opposition, trusting the experts to get it right.  Plaintiff submits that Ms. Newcomb's statement on training regarding the FISA-specific aspects of the Litigation Section was solely for the purpose of neutralizing what she believed was the Plaintiff's competitive advantage over Mr. Ridge.

54.     In Lathram v. Snow, 336 F.3d 1085 (D.C. Cir. 2003), Lathram alleged employment discrimination against U.S. Customs when Customs hired a male (Boyd) directly into a GS-15 position from outside of the Government and into a position with a higher salary than Lathram's. Lathram, 336 F.3d at 1086.  In finding for Lathram, the Circuit Court citing the District Court record indicated that "the undisputed record shows that when he was hired, Boyd had no experience in public affairs or public relations, Lathram, 336 F.3d at 1091...and "at the time Customs hired Boyd, Lathram had already been working as a Public Affairs Specialist for three years." Lathram, 336 F.3d at 1092. **"If a factfinder can conclude that a reasonable employer would have found plaintiff to be significantly better qualified for the job, but the employer did not, the fact finder can legitimately infer that the employer consciously selected a less-qualified candidate - something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture."** Lathram, 336 F.3d at 1091 (Emphasis added).  In the instant case, Ms. Newcomb and Ms. Gauhar chose Mr. Ridge to supervise that which he has never done, over Plaintiff with three years FISA Litigation experience, which Plaintiff submits is something that employers usually do not do.

55.     The management/supervisory experience justification and the minimization of the significance of FISA Litigation experience by the Defendant is clearly pretextual, and the strong consideration which caused their decision to promote Mr. Ridge, with no FISA Litigation experience,

and deny promotion to the Plaintiff, with 3 years FISA Litigation experience, was none other than race-based discrimination.

## III.   **High Level Meetings**

56.     When Plaintiff was an Assistant U.S. Attorney, witness examination before the grand jury was a skill previously mastered while Plaintiff was an Assistant District Attorney in the New York County District Attorney's Office.  In the federal grand jury, hearsay is admissible, while in the New York State grand jury, hearsay is not admissible.  The different forums required one to become familiar with a new rule, but the skill of witness examination was the same.

57.     The Defendant identifies no unique skill inherent in the high-level meeting experience that Plaintiff has not acquired in his meetings with Attorney General Ashcroft, FBI Director Mueller, different U.S. Attorneys, the Assistant Attorney General of the Criminal Division, former Deputy Assistant Attorney General Keeney, another Criminal Division Deputy Assistant Attorney General, Plaintiff's countless appearances before the Second Circuit Court of Appeals, and meetings attended while in OI dealing with national security matters.  An attorney's job is to master the subject matter of discussion regardless of the level of professional success experienced by the other attendees.

58.     Plaintiff briefed Attorney General Ashcroft on the murder of an Assistant U.S. Attorney prior to General Ashcroft's network television appearance to discuss the case.  Plaintiff briefed FBI Director Mueller on an arms-smuggling case, with witnesses and evidence from Asia and Europe, involving over 100,000 military weapons parts smuggled into the U.S. from Vietnam, and "deposed" the Director for a related Giglio filing.  Plaintiff briefed the Criminal Division AAG, the U.S. Attorney, and Deputy AAG Keeney on the murder investigation.  Plaintiff briefed Deputy AAG Keeney and another Deputy AAG on the arms smuggling investigation, and briefed a U.S. Attorney concerning a complex FISA Litigation matter.  In addition, the numerous appearances before a "hot

bench" in the Second Circuit has prepared Plaintiff well to attend any meeting and express himself clearly and succinctly in the course of zealously advocating his position. **Exhibit K, pages 11-12**.

59.     However, Plaintiff's extensive experience in this regard was for naught because Ms. Newcomb did not inquire as to the extent of Plaintiff's "high-level meeting" experience in Plaintiff's informal discussion or in the formal interview relating to the Deputy Chief position, despite the Defendant's claim of its importance to the promotion decision. **Exhibit K, page16**. Ms. Newcomb neither expressed any concern about Plaintiff's conduct in meetings he attended at her direction while in OI or meetings attended before Plaintiff joined the Litigation Section, nor questioned Plaintiff regarding any concerns Ms. Newcomb might have about Plaintiff representing OI or the Litigation Section in meetings with other government agency personnel.

60.     In fact, in the Plaintiff's performance evaluation for the rating period ending in June 2010, before the Defendant was contacted by EEO, Ms. Newcomb wrote the following: "Mr Nesbitt has prepared paperwork for filings relating to FISA litigation matters in several federal district courts throughout the country. This work required interacting and coordinating with others within the National Security Division and the U.S. Intelligence Community...Mr. Nesbitt responds timely and efficiently to the litigation needs of components of the Department of Justice, as well as to our partners in the U.S. Intelligence Community. His interactions with others inside and outside the Department of Justice are courteous and professional." **Exhibit Y**. The Defendant's position regarding "high-level meetings," and any stated concerns regarding Plaintiff's interactions with members in the U.S. Intelligence Community, are additional examples of the post hoc justifications which the <u>Dennis</u> court described.

IV.     **Leadership Skills and Experience**

61.     Ms. Newcomb commented on these issues in her affidavit.  Plaintiff will comment briefly on Ms. Newcomb's responses.

(A) **Sensitive Collection Technique Disclosed on the Internet**:

62.     Several months prior to the vacancy announcement, in January 2010, Ms. Newcomb had been informed that information regarding a sensitive collection technique had been exposed through a filing in the United States District Court.  Such a disclosure could cause exceptionally grave damage to the national security of the United States by adversely affecting both terrorism and espionage investigations.  Because Plaintiff had worked on the FISA Litigation in the case, Ms. Newcomb alerted Plaintiff to the situation.  Plaintiff further investigated and informed Ms. Newcomb that the information was not only filed in Court, but was also accessible on the Internet.  Having been so informed, Ms. Newcomb decided to leave the office for the day and told the Plaintiff that she had determined that OI couldn't be blamed for the error.  However, rather than worrying about fault or blame, the most important concern in Plaintiff's judgment, was how to mask the disclosure and what to do if masking was not possible.  Whether the problem could be masked was unknown when Ms. Newcomb decided to leave.  Plaintiff, in a display of "quiet" leadership, stayed and "quietly" and effectively found the solution, and informed Ms. Newcomb and the attorney from the Counter-Espionage Section.  **Exhibit K, pages 16-17;  Exhibit T**.  Ms. Newcomb stated in her affidavit that "I do not recall anything coming of this."  **Exhibit B, Answer 47**.   Well, that's precisely the point, and the perfect "quiet" result.

**(B)** **Litigation Section Review Of Publicly Filed Documents Containing FISA Information**:

63.     Based on the incident above and another incident which potentially revealed sensitive collections in a publicly filed document, Plaintiff and a colleague drafted a proposal for Ms. Newcomb's and Ms. Gauhar's consideration.   The proposal was for OI to review documents containing FISA-derived information before public filing.   The proposal was based on the common experience of Plaintiff's colleague, who worked in the Tax Division where prior approval is needed to indict charges under Title 26, and Plaintiff's experience in Organized Crime, where prior approval is needed for RICO prosecutions.   **Exhibit U**.

64.     In her affidavit, Ms Newcomb clearly misstates the language of the proposal as one "to review all search warrants and indictments relating to national security throughout the country before prosecutors can proceed with their cases. **Exhibit B, Answer 47**.  Ms. Newcomb attempts to negate the fact that the proposal demonstrates the Plaintiff's ability to lead and work collaboratively with others while bringing insight to an important aspect of FISA Litigation.

**(C)**     **Training For Litigation Section Attorneys**

65.     On June 2, 2010, immediately after Mr. Ridge's selection, Ms. Newcomb implemented Plaintiff's proposal to address the "knowledge deficit" by scheduling a mandatory training session for Litigation Section attorneys.  **Exhibit K, page 7; Exhibit V**.  The presentation was to be delivered by an attorney from the Counter-Espionage Section.  Ms. Newcomb concedes following Plaintiff's proposal regarding CIPA training.  **Exhibit B, Answer 47**.  It should be noted that Plaintiff communicated "quietly" and clearly enough for Ms. Newcomb to adopt Plaintiff's proposal.

**(D)**     **The FBI 997 Process**

66.     A 997 is a form produced by the FBI to which attorneys from OI have limited access. When performing some of their duties, the OI attorney usually engages in multiple e-mails with FBI attorneys trying to elicit sufficient factual information to pass on to the OI supervisors. The back and forth between OI and FBI attorneys can on occasion cause some tension. Plaintiff's suggestion was to make arrangements with the FBI to allow OI attorneys greater access to the 997. **Exhibit W**. Ms. Newcomb says that she doesn't recall any suggestion by Plaintiff regarding the 997 process. **Exhibit B, Answer 47**. However, the record demonstrates that Ms. Newcomb was made aware of Plaintiff's proposal on June 22, 2010, in an e-mail to Mr. Ridge and Ms. Newcomb indicating "BTW, I just want to point out that this concept had its genesis with [Plaintiff], so he really deserves any credit." **Exhibit W**.

67.     Plaintiff's 997 suggestion came after Mr. Ridge's selection, but is included here for two reasons (a) because Ms. Newcomb assigned Mr. Ridge to negotiate with the FBI on the 997, and it is with the knowledge of the quality of Plaintiff's work in FISA Litigation matters which caused Ms. Newcomb to "sing Plaintiff praises" and the above examples of leadership in FISA Litigation matters, that Ms. Newcomb told EEO that "Based on [her] experience as [Plaintiff's] supervisor, **and his responses in the interview,** she was not convinced that [Plaintiff] would be an effective supervisor of Section attorneys or a representative of the Section, or, depending on the context, the Office of Intelligence, the National Security Division, or the Department." **Exhibit O, page 4, paragraph 1**, and (b) because despite these examples of Plaintiff's work and leadership qualities, with the possibility of a sensitive disclosure neutralized, and Ms. Newcomb's adoption of two of Plaintiff's suggestions, nevertheless, after Plaintiff contacted EEO, Ms. Newcomb and Mr. Ridge saw fit to downgrade Plaintiff's performance evaluation.

68.    Ms. Newcomb's stated conclusions regarding Plaintiff's potential effectiveness appear on their face to be contrary to her experience with Plaintiff. See **Exhibit Y**. "Although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution. Particularly...where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination. Aka v. Washington Hospital Center, 156 F.3d at 1298.

69.    Ms Newcomb's conclusions **must** be weighed in light of the false assertions made by her and other officials to the EEO in their attempts to justify Mr. Ridge's selection; in light of their silence regarding the motivation for abandoning the selection process, and in light of their failure to mention the full extent of Plaintiff's FISA Litigation experience and Mr. Ridge's complete lack of such experience. "Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination...**if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so."** Fischbach v. District of Columbia Department of Corrections, 86 F.3d 1180, 1183 (D.C. Cir 1996) (Emphasis added).

70.    In Kalinoski v. Gutierrez, 435 F. Supp.2d 55, 68 (D.D.C. 2006), where plaintiff's supervisor mentioned in a declaration that plaintiff was transferred because of her job performance, but stated in a deposition that plaintiff was transferred for reasons other than her job performance, the Court noted that "this evidence of alternate justifications tends to undercut the proffered explanation." As noted above, Ms. Newcomb told the EEO that her decision was based in part on Plaintiff's responses in the interview. **Exhibit O, page 4, paragraph 1**. However, when Ms. Newcomb discussed Plaintiff's interview responses in her affidavit, under penalty of perjury, she

responded as follows: **Question 42: To what extent, if any, did the applicants' comparative performance during their interviews impact on your selection?  Answer: None.  Exhibit B**.

71.    The Court of Appeals in <u>Aka</u> notes that "When the Plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's actions.  Events have causes; if the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination."  <u>Aka v. Washington Hospital Center</u>, 156 F.3d at 1292.

72.    Therefore, in accordance with the facts and the law as stated above, Plaintiff submits that summary judgment is precluded because the facts asserted by Plaintiff in rebuttal to Defendant's justifications establish that the record fails to conclusively demonstrate a legitimate non-discriminatory reason for the Defendant's promotion decision, and that Plaintiff's rebuttal is sufficiently strong such that a reasonable jury could conclude that the Defendant's justifications are pretextual and solely designed to mask a promotion decision which was the product of race-based discrimination.

V.                                      **<u>CONCLUSION</u>**

73.    "Because the typical Title VII discrimination or retaliation case is premised on the employers's subjective motivations, the critical issue concerns what was taking place in the subject individuals' minds.  Thus, if the individuals who allegedly took discriminatory/retaliatory acts deny that discrimination or retaliation motivated their actions, because no one else knows precisely what went on inside their minds, it is difficult (if not impossible) for there not to be a question of fact as to what actually motivated them. <u>Thomas v. Washington Metropolitan Area Transit Authority</u>, 2012 WL 6055577 at *3 (D.D.C. 2012).

74.     Common human experience tells us that people often try to hide the truth. Mass media has shown that people try to hide the truth about many different things. The false assertions made by the Defendant to EEO about the application standards raises the question of what truth the Defendant is hiding, and whether that truth is race-based discrimination in the selection of the Deputy Chief of Litigation. This case presents issues of material fact about which there is a genuine dispute, which would permit a reasonable jury to find that Plaintiff is the victim of race-based discrimination in the promotion denial.

75.     In addition to the Defendant's false assertions being disproved, none of the Defendant's list of supposedly nondiscriminatory justifications for its promotion decision withstand close scrutiny and cannot be deemed established and undisputed as a matter of law.

For all the reasons set forth above, the Defendant's Motion For Summary Judgment should be denied.


I affirm, under penalty of perjury, that the foregoing factual statements are true and correct.


_Joshua W. Nesbitt, Pro Se_
1629 Tucker Road
Fort Washington, Maryland 20744
(301) 573-3278
joshuawnesbitt@yahoo.com


Sworn before me on this ___ day of June, 2013

TERESITA MUTTON
NOTARY PUBLIC



# EXHIBIT CC

Civil Action No. 12-717 (RWR)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                 :
JOSHUA NESBITT,                  :          COPY
1629 Tucker Road                 :
Fort Washington, MD  20744       :
                                 :
            Plaintiff,           :    Case No.:
                                 :    1:12-cv-00717-RWR
        v.                       :
                                 :
ERIC H. HOLDER, JR.,             :
Attorney General,                :
Department of Justice            :
950 Pennsylvania Ave, NW         :
Washington, D.C.  20530,         :
                                 :
            Defendant.           :
                                 :
- - - - - - - - - - - - - - - - x

            Washington, D.C.

            Tuesday, December 4, 2012


Deposition of

            JOSHUA NESBITT

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Stacey Raikes, RPR, Notary

Public in and for the District of Columbia, in the law

offices of the United States Attorney's Office, 501 3rd

Street, N.W., commencing at 10:08 a.m.



            Diversified Reporting Services, Inc.

1       A.   Yes.

2       Q.   **On page two, Bates stamped 16, I just need**

3  **a little bit of clarification, please.  Last**

4  **paragraph, you say, "From 2006 until 2009, I had no**

5  **problems with OI management.  However, in 2009, OI**

6  **managers made a series of false statements**

7  **disparaging my professional reputation immediately**

8  **after I applied for a supervisory position that**

9  **year."  To what are you referring, please?**

10      A.   Okay.

11      Q.   **What actions, what disparaging remarks did**

12  **they make?**

13      A.   All right.  This is going to be a long

14  answer.

15      Q.   **Please.**

16      A.   Okay.

17      Q.   **This is your deposition, so go ahead and**

18  **tell us what happened.**

19      A.   All right.  I don't know the exact date,

20  but some time prior to December of '09 and '08 when

21  I joined the counterintelligence unit, there was an

22  announcement for three openings as a deputy unit

23  chief in the counterterrorism unit.

24           The counterterrorism unit is

25  different from the CT3 unit, of which I was a

1   member, but it had different kind of FISA

2   applications targeting terrorist suspects.

3                   For the same reasons that I indicated

4   before, an opportunity to, you know, to do more in

5   the office, to contribute more in the office, an

6   opportunity to maybe get a chance to write those

7   motions regarding matters of first impression, I

8   sought this supervisory position, so I put my

9   application in by sending an e-mail to Tashina

10  Gauhar and Stuart Evans.  And then after -- almost

11  immediately after I applied, I had scheduled

12  vacation.  I went on vacation.  Okay.

13                  Immediately before I went on

14  vacation, I had a counterespionage case where there

15  was a highly technical issue that needed to be

16  resolved.  Ms. Farabee, Lisa Farabee, who was the

17  head of the CI unit, and I met with the FBI to

18  discuss these issues.

19      **Q.    She was your immediate supervisor then?**

20      A.    Correct.

21      **Q.    Okay.**

22      A.    The target of that unit was an

23  organization, an entity, and that organization had

24  locations in more than one place, operated in more

25  than one place in the United States.

1            So immediately before I go on

2    vacation, I check my workload because I have to ask

3    people to cover cases when I'll be out and I have to

4    see what work I can leave and attend to once I

5    return.  So I saw the name of the entity in a queue

6    on my computer.  The problem was it wasn't the

7    location of the entity with which I had the meeting

8    with Ms. Farabee and the FBI, it was that same

9    entity at a different location and I didn't check to

10   see that it was at a different location.

11            So when I left for vacation, I didn't

12   ask anyone to cover that case because I thought it

13   was the one that we had been speaking of and I knew

14   that those authorities were not going to expire by

15   the time I returned from vacation.  Turns out the

16   entity that was actually listed at the second

17   location, the authorities for their surveillance was

18   going to expire the Friday before I returned.

19            So I leave for vacation.  I send an

20   e-mail to Ms. Farabee and the CI supervisors

21   indicating this is the case, this is the status,

22   this is the person that's covering.  I leave my cell

23   phone number as my contact while I'm away.

24            On the first Monday of my vacation --

25   so I leave on Friday, the weekend, and then the

1    first Monday of my vacation, as I'm driving up the

2    Baltimore Washington Parkway, my cell phone goes

3    off, so I find a place to pull over and I hear the

4    message and it's from Ms. Farabee and she's

5    inquiring about the status of the draft on that

6    entity and she says you remember the case that we

7    had the meeting on?  Well, not that one, but the

8    other one.  We're on an open line, so she can't

9    speak to me in detail.  She says that is the one

10   that's due.  Do you have a draft?  I haven't seen a

11   draft.

12                So I call her back and admit that I

13   had not done the draft.  I apologize and she says

14   well, you know, don't worry about it, we'll get

15   someone to cover it, just needed to know the status.

16   So I went on, you know, continued my vacation.

17                I come back the Tuesday after Labor

18   Day and the first thing I do is go through my

19   e-mails to see what happened while I was away.

20   There is a responsive e-mail to the e-mail I had

21   sent to Ms. Farabee and the other CI supervisors

22   where I indicated my cases, the status and the

23   coverage, there's a responsive e-mail from

24   Ms. Farabee asking the other supervisors whether or

25   not they had seen a draft of the application about

1    which we spoke and it said I tried to contact Josh

2    at the number, in essence.  I'm paraphrasing.  I

3    don't remember exactly.  I tried to contact Josh at

4    the number below, but it appears not to be working.

5                          I looked at that and I was shocked

6    because I said to myself why would she write that?

7    We spoke.  And my concern was -- well, that was it,

8    why would she write that?  Ms. Farabee is very

9    bright and she uses language with precision.  She's

10   not known to misspeak either verbally or, you know,

11   in writing.  So I didn't understand the appears not

12   to be working because we had spoken and she very

13   well knew my phone did work.  So while I was

14   wondering about that, a second incident occurred.

15                         A colleague of ours, his name was

16   Carlos, I forget Carlos' last name, had died and his

17   funeral was on the Friday after I returned to work.

18   On that day, I had a draft of an application, FISA

19   application, that was due to be submitted to the

20   FISA court.  The rules are such that when FISA

21   authorities are going to be renewed, we would

22   provide a draft early to the FISA courts so that the

23   court clerks and the judge could look and see if

24   they have any concerns that needed to be addressed

25   ahead of time so that the process would go along

1    more smoothly.  Every line attorney has those drafts

2    due, you know, whenever they have a renewal

3    application.  It's not anything of any moment, it's

4    just part of your duties.  So I had a draft due on

5    the day of Carlos' funeral.

6         **Q.   I'm sorry, is this still connected to the**

7    **story about Ms. Farabee --**

8         A.   Yes.

9         **Q.   -- sending that e-mail?**

10        A.   Yes.

11        **Q.   Because I'm not seeing the nexus.**

12        A.   I'm about --

13        **Q.   But you can go ahead and explain.**

14        A.   I'm about to put it together for you.

15        **Q.   Okay, thank you.**

16        A.   So on Thursday, I had not finished the

17   draft that had to be filed on Friday because there

18   was information that I needed from the FBI which

19   they had not yet provided.  The FBI agent indicated

20   that he would get me that information on Friday in

21   time for me to file the draft.

22              So I told the supervisor who was

23   overseeing that particular application, Michael

24   Duclose, on Thursday that I wouldn't have the

25   information from the FBI until Friday, that I was

1    going to go to Carlos' funeral on Friday morning,

2    that I would come back, input the information from

3    the FBI and then get it to him for his review in

4    time for us to file the draft on Friday.

5                    Mike said that he wasn't going to be

6    in on Friday, so he asked me if I could finish the

7    draft on Thursday, let him review it and if the only

8    change that needed to be made was the insertion of

9    the information from the FBI, he would approve the

10   filing of the draft on Thursday.  Then I could go to

11   the funeral, input information and file the draft

12   and that's what we did.

13                    On Friday, after I came from the

14   funeral, I saw a colleague, Heather Trew.

15        **Q.    Heather?**

16        A.    Trew, T-R-E-W.  She was walking down the

17   hallway and was surprised to see me.  What are you

18   doing here she asked me.  And she said I heard that

19   you were going to be out all day.  And I told her

20   no, that I had to file this draft in court and I had

21   just gone to Carlos' funeral.  She said in response

22   to my comment about the draft and I bet you got a

23   lot of calls about that.  And I didn't understand

24   why she would say that because filing drafts was

25   something routine.  So I asked her, you know, why

1   would anyone be calling me about the draft?  And she

2   said that she had heard that I had left

3   responsibility for filing the draft to a woman, MM,

4   who, the previous day, had been fired from the

5   office and escorted from the building for security

6   violations and, therefore, my draft was not going to

7   be submitted in a timely basis.  And so from.

8       Q.   **Sorry, stop, please.**

9            MS. MOMENI:  I'm going to ask you to

10           strike the women's name from the record,

11           please.

12      A.   Okay.

13           MS. MOMENI:  Privacy concerns, perhaps, I

14           just want her name -- you can just put her

15           initials in, please.  Thank you.

16      A.   Okay, sorry.

17      Q.   **No problem.**

18      A.   And so hearing what Ms. Trew said to me

19   and realizing how divorced from the truth it was and

20   knowing that a line attorney is not going to be

21   concerned with whether or not a line attorney --

22   another line attorney has to file a draft, I knew

23   that what Ms. Trew had heard and what she was

24   conveying to me came from management.

25                     And so this is the relationship to

1    the incident with Ms. Farabee because I'm looking at

2    these two things, the number appears not to be

3    working when, in fact, we spoke.

4        Q.    I'm sorry, appears what?

5        A.    She said the number, my number, appeared

6    not to be working.

7        Q.    Working, uh-huh.

8        A.    When, in fact, we spoke.  And there is

9    this other scenario, rumor, completely divorced from

10   the truth about the filing of my draft, so Josh is

11   irresponsible, he doesn't leave good contact

12   information and he has an association with the

13   person who was fired and doesn't get his drafts in

14   in a timely fashion.  Both of those things happened

15   immediately after I filed my application to be a

16   deputy unit chief in the counterterrorism section.

17             I had, up until that point, never

18   heard -- had never heard of any derogatory rumors or

19   comments regarding my work.  But in this -- if you

20   look at this temporal relationship, you have to say

21   he tries to move up in the supervisory chain and

22   then you have these derogatory things.

23             Now, if you look back at

24   Ms. Farabee's e-mail.

25       Q.    Which one, the one with the phone number

1    **issue?**

2    A.    Right.  One of two things happened:  Since

3    we know we spoke and I have the telephone records to

4    show the call from my cell phone to her direct line

5    in her office.

6    **Q.    I'm sorry, you did get the telephone**

7    **records for that day?**

8    A.    Yes, I did.  Either she misdialed a 301

9    number different from mine, wrote that e-mail and

10   then spoke --

11   **Q.    And then realized she'd made the mistake?**

12   A.    -- to me later.

13   **Q.    Yeah.**

14   A.    If that were the scenario, my question was

15   then why would she leave the impression that the

16   error was mine and not hers knowing how exact she is

17   with language, knowing how demanding she is as a

18   supervisor, why would she leave the impression if

19   she knew that she had failed to dial, that I was the

20   one who didn't provide good contact information.  If

21   she didn't dial a 301 number in error, then her

22   statement is just a lie.

23   **Q.    So I have two questions for you.  I want**

24   **to you stop right there.  You've put a lot of**

25   **information on the table at this point.  You said**

1   **you got the telephone records?**

2        A.    I got the telephone records from my cell

3   phone showing a call to my voice mail and my

4   immediately dialing Ms. Farabee's number.

5        **Q.    Her back.  So you didn't get the**

6   **department's phone records?**

7        A.    Oh, no.  I would have no way to get those.

8        **Q.    Did you ever ask her why she sent that**

9   **e-mail out?**

10       A.    No.

11       **Q.    Why not?  Obviously, you were offended; am**

12  **I wrong?  Were you offended by this?**

13       A.    I was very much offended.

14       **Q.    Of course, okay, as I would be, I guess, I**

15  **don't know, but why didn't you ask her?  She was**

16  **your boss.  Did you have a decent relationship with**

17  **her?**

18       A.    I thought so up until that time.  I felt

19  like I was being hit in the solar plexus because,

20  like I said, I've never known her to be inaccurate

21  in anything that she said.  Certainly not to me.

22       **Q.    So the takeaway that the other supervisors**

23  **would have had from her e-mail would be that you're**

24  **irresponsible?**

25       A.    Correct.

1      **Q.    Did you hear that from any supervisor**

2   **subsequently?**

3      A.    I didn't ask them.  I didn't discuss the

4   issue with them and no one came up and approached me

5   and said you know you really screwed that up.

6      **Q.    Just the phone number issue, okay.**

7                    **And then the other question I have is**

8   **about the rumors that you allegedly left the person**

9   **who was fired to file this brief for you.**

10     A.    Yes.

11     **Q.    Did you ever try to figure out where it**

12  **emanated from?**

13     A.    I concluded that it only emanated from a

14  management person because one line attorney has no

15  interest in whether another line attorney has to

16  file a brief with the court, a draft with the court.

17  The only people who are interested in whether the

18  drafts are filed with the court are the supervisors

19  who are overseeing the attorneys and need to make

20  sure that those drafts are filed on a timely basis.

21                    So, for example, let's say there's a

22  case that's going to appear on the FISA court docket

23  next Wednesday.  If you're a supervisor, you're

24  looking at the FISA court docket for next week and

25  you see that there's an application for renewal on

1    Wednesday.  So on Monday and Tuesday of this week,

2    you're going to make sure that the person

3    responsible for that has their draft ready to go by

4    Wednesday.  A line attorney isn't going to know or

5    care what the situation is regarding filing drafts

6    for another line attorney.  So the only one with

7    that concern would be a supervisor.  So I concluded

8    that the information, the rumors that Ms. Trew

9    passed on to me emanated from one of the

10   supervisors.

11        Q.   **Did you ask Ms. Trew where she heard that**

12   **information?**

13        A.   No.

14        Q.   **Where she got that information?**

15        A.   No.

16        Q.   **Why not?**

17        A.   I didn't think it was likely that she

18   would tell me.

19        Q.   **Had you advised Ms. Farabee that you had**

20   **had the conversation with the other supervisor about**

21   **filing on Friday if the only change would be for**

22   **your addition of the FBI information?**

23        A.   No.

24        Q.   **So she didn't know?**

25        A.   I don't know what she knew.

 1       Q.   Okay, fair enough.

 2            All right, so I'm still trying to
 3  figure out that last paragraph on page 16 on Exhibit
 4  5.  What does that have to do with your
 5  non-selection in this case?  You say, "However, in
 6  2009, OI managers made a series of false statements
 7  disparaging my professional reputation immediately
 8  after I applied for the position that year."  What
 9  does that have to do with you not getting the
10  position?  Did Ms. Farabee have anything to do with
11  your not getting the deputy position in litigation?

12       A.   Well, let me answer your first question

13  first.

14       Q.   Please.

15       A.   After these two things, these two
16  incidents that I described occurred, I became
17  concerned, as I said, that people were making
18  disparaging remarks about my professional
19  capabilities and how I discharged my professional
20  responsibilities and this happened immediately after
21  my application for a supervisory position, so I
22  thought if anyone was going to try to make sure that
23  I didn't rise in the supervisory ranks, well the
24  best way to do that would be to give me a less than
25  satisfactory performance evaluation.

1    **Q.    Did you ever get one of those?**

2         A.    After I filed this complaint and on my

3    exit from the Office of Intelligence, my gradings

4    were downgraded.  I was downgraded in my ratings by

5    Ms. Newcomb.

6         **Q.    But that's not a part of this case?**

7         A.    No.

8         **Q.    Okay, go on.  I mean in 2009.**

9         A.    No.

10        **Q.    Okay.**

11        A.    So one of my motivations for leaving

12   counterintelligence section and going to litigation

13   was to not give Ms. Farabee or any other supervisor

14   from which the rumor emanated about the filing of

15   the drafts an opportunity to hurt me professionally

16   in a performance evaluation, so I transferred to the

17   Litigation Section.

18                Once I transferred to the Litigation

19   Section, my cases in the counterintelligence unit

20   had to be reassigned.  I received an e-mail -- no,

21   I'm sorry, I had received a notification in my queue

22   after I had transferred to the Litigation Section

23   indicating that the case with the entity about which

24   we first spoke was still assigned to me.

25        **Q.    I don't remember the entity about which we**

1    **first spoke.**

2         A.    The entity where I had failed to realize

3    that it was the entity at the second location.

4         **Q.    Oh, okay.**

5         A.    Where the renewal was due versus the

6    complicated issue about where Ms. Farabee and I met

7    with the FBI.

8         **Q.    Understood, okay.**

9         A.    Okay.  That entity popped up in my queue

10   as still being assigned to me.  So I sent an e-mail

11   to Ms. Farabee and Ms. Newcomb and I believe some of

12   the other -- I cc'd some of the other CI supervisors

13   indicating this case was still assigned to me and

14   needed to be reassigned.

15                    Ms. Farabee responded by asking me to

16   tell her the status of the case before she decided

17   to whom she was going to reassign it.  And so I

18   ended up telling her about certain work that I had

19   done and inquiries that I had made.

20                    One of the issues that we had was to

21   determine what authorities -- what level of FISA

22   surveillance authority we needed and what measures

23   to conduct oversight were necessary in the

24   relatively unique plan of how the FBI wanted to

25   conduct this surveillance.  We didn't know.  We

1  weren't sure what authorities were needed and how we

2  were going to conduct the oversight.

3                 I had read a FISA court decision

4  which seemed to me to address some of the issues

5  that we had in our discussion, but I'm not a

6  technical person, so I didn't know whether -- the

7  language seemed the same from what I heard from the

8  FBI and what was in the FISA court decision, but I

9  couldn't say that definitively.

10                So I contacted the attorney in the

11  office who had drafted the motion that resulted in

12  that FISA court decision and that was the chief of

13  the Oversight Section, Kevin O'Connor, and I copied

14  and pasted the e-mail I received from the FBI saying

15  this is what we want to do and I showed Kevin the

16  language in the court decision.  I said are you guys

17  talking about the same thing?  Can you please advise

18  me?  I sent the same or similar e-mail to the FBI

19  agent saying this is what I found in the FISA court

20  decision, run this by your technical people and see

21  if this is consistent with what it is they're

22  thinking of doing.  I also expressed to them that

23  this was not something that was approved by OI, but

24  it was, you know, me thinking out loud and just

25  trying to learn more, you know, if I have something

1    that might work.  So I had received no substantive

2    answer on either of those e-mails.

3                    I forwarded both of those e-mails to

4    Ms. Farabee and told her in discussing, you know, in

5    disclosing the status of the case, that I had not

6    received answers, but here are the e-mails.

7    Ms. Farabee came in my office and started yelling

8    and screaming at me telling me that she thought that

9    my communication with the FBI was inappropriate.

10         Q.    Was there anyone else there?

11         A.    No, just me and Ms. Farabee.  And she said

12   that if I had any of these musings, I should come to

13   her.  And I explained to her that I was trying to

14   educate myself regarding the issue.  It wouldn't

15   make sense to go to her with a proposed solution

16   when she would just ask me questions to which I had

17   no answers, so I was trying to educate myself first.

18                    She said well I should have at least,

19   you know, discussed it with someone who had worked

20   on the brief that was submitted to the court

21   completely ignoring the fact that I forwarded to her

22   the e-mail with Kevin O'Connor who had signed the

23   brief.

24                    And then in a complete non sequitur,

25   had nothing to do with our conversation, Ms. Farabee

1    said well I don't know what Nancy thinks about it,

2    referring to Ms. Newcomb, who had nothing to do with

3    my work in CI, she says, but I think that this is

4    communication is inappropriate.

5                    So in that context, with the e-mail

6    saying that the number appears not to be working

7    when she spoke, in the context of that incident

8    being followed by a rumor completely divorced from

9    the truth, Ms. Farabee's comment seemed to me to be

10    a threat to further disparage my professional

11    reputation by saying something derogatory about my

12    work to my new supervisor Ms. Newcomb.

13                    So after that conversation with

14    Ms. Farabee, I went to her boss, who is the chief of

15    the Operations Section, Gabriel Sanz-Rexach --

16        **Q.    Let me stop you there.  I have a couple**

17    **points to clarify, please.**

18                    **Does Ms. Farabee have anything to do**

19    **with your non-selection for the deputy position in**

20    **counterintelligence was it, the first one you**

21    **applied for in 2009?**

22        A.    Counterterrorism.

23        **Q.    Counterterrorism.**

24        A.    I have no way of knowing that.

25        **Q.    Was she the selecting official?**

1      A.    I have no way of knowing that.  All I know

2    is that the applications went to Stuart Evans and

3    Tashina Gauhar.  I have no idea with whom they

4    consulted in making their decision.

5         Q.    So she could have or she couldn't have

6    had, either way, right?

7         A.    Correct.

8         Q.    You said there was a series of false

9    statements by management.  One you attribute to

10   Ms. Farabee?

11        A.    Farabee.

12        Q.    The phone number.  The second one was

13   about the brief being filed by a colleague who was

14   fired, and you're not sure who that originated from,

15   but you were speculating that it originated --

16        A.    I concluded that it originated from

17   management based on the dynamics of the office.

18        Q.    Then those are the only two incidences,

19   right?

20        A.    Well, then you have this threat to tell

21   Ms. Newcomb about my work.  You know, I'm a loose

22   canon who communicates inappropriately with the FBI.

23        Q.    Oh, so you took it as a threat?

24        A.    Yes.

25        Q.    I see, okay.

 1        A.    Because Ms. Newcomb had nothing to do with

 2   my work in the counterintelligence section.  She had

 3   nothing to do with the work being done on that

 4   particular FISA application.

 5        Q.    **It wasn't going go to litigation at some**

 6   **point?**

 7        A.    If I had a crystal ball, I could tell you,

 8   but no one knew because the surveillances hadn't

 9   even begun, so whether or not there would be a

10   criminal prosecution down the road, there was no way

11   of knowing that.

12        Q.    **Did you ask Ms. Farabee if she was**

13   **threatening you?**

14        A.    No.

15        Q.    **Yeah, okay.  And so you went to her boss**

16   **you said?**

17        A.    So I went to her boss.

18        Q.    **Whose name was?**

19        A.    Gabriel Sanz-Rexach.

20        Q.    **And he was the number two man in the NSD;**

21   **is that correct?**

22        A.    No, he was the chief of the Operations

23   Section.  The Operations Section was broken up into

24   the counterterrorism three unit, the

25   counterintelligence unit and the counterterrorism

1   unit and that comprised the Operations Section.  So

2   Mr. Rexach was the chief of the Operations Section,

3   therefore, had oversight and was over the

4   counterintelligence unit and was Ms. Farabee's

5   supervisor.

6        Q.   **Was Ms. Farabee the deputy chief?**

7        A.   No, Ms. Farabee was the chief of

8   counterintelligence unit within the Operations

9   Section.

10       Q.   **Oh, I see.  I'm looking at Exhibit 2,**

11   **which was your organizational flow chart.  I see**

12   **that counterterrorism and counterespionage sections**

13   **answer to a deputy assistant general.**

14       A.   No.

15       Q.   **In 2007.**

16       A.   On this chart.

17       Q.   **You see I'm looking at Exhibit 2?**

18       A.   Those are not the -- the counterespionage

19   section and the counterterrorism section are

20   litigating sections within the Department of

21   Justice.  They're not in the Office of Intelligence,

22   okay?

23       Q.   **So where did Ms. Farabee and you fit in at**

24   **the time in 2009?**

25       A.   So Ms. Farabee and I, under Office of

1    Intelligence, you would look to the left and see

2    Operations Section.  Within the Operations Section,

3    there were various units.  And so there is a

4    counterintelligence unit that dealt with

5    counterespionage FISA targets.

6        Q.    Understood.

7        A.    Counterterrorism unit that dealt with

8    certain counterterrorism targets.

9        Q.    Right.

10       A.    And the CT3, which is now the special

11   operations unit, that targeted other types of

12   terrorism targets.

13              So Ms. Farabee was chief of the

14   counterintelligence unit within the Operations

15   Section of the Office of Intelligence and so I went

16   to the chief of the Operations Section.

17       Q.    And his name was Carlos?

18       A.    No, Gabriel Sanz-Rexach.

19       Q.    Can you spell his last name?

20       A.    S-A-N-Z, hyphen, R-E-X-A-C-H.

21       Q.    So you had this conversation with Gabriel?

22       A.    Correct.

23       Q.    And what did he say?  Tell me about the

24   conversation, rather.

25       A.    Right.  I went to him and I informed him

1    of everything that I just told you about from the

2    time that I returned from vacation, Ms. Farabee's

3    e-mail, the rumor and then Ms. Farabee yelling at me

4    in the office about my communication with the FBI

5    and the statement that she made about going to

6    Nancy.  I told him that I thought that it was

7    possible that the first two incidents, the Josh

8    doesn't leave good contact information and the Josh

9    doesn't get his drafts filed in a timely manner,

10   were rumors that adversely affected my application

11   for the counterterrorism unit deputy unit chief

12   position.

13        **Q.    I'm sorry, did you tell me that those**

14   **incidents happened after you had already applied and**

15   **had been denied?**

16        A.    Immediately after -- no, immediately after

17   I had filed, but before I had been denied.

18        **Q.    But before you had been denied?**

19        A.    Correct.

20        **Q.    I see.  The job for that unit chief?**

21        A.    Correct.

22        **Q.    Okay, got it.**

23        A.    And so I explained to him my concerns

24   because I had not been aware of any problems that I

25   had with management and now there are these rumors

1    that say, you know, that are damaging to my

2    professional reputation and they weren't based on

3    facts and I was concerned about what was going on.

4                          Mr. Rexach told me that -- he assured

5    me that he had not heard any disparaging, derogatory

6    information about me during the course of the

7    assessment of the promotion to the counterterrorism

8    deputy unit chief position.  He said that there were

9    a number of applicants, all of them highly

10   qualified, and that it was a difficult decision to

11   be made.  He said that one of the things -- he said

12   that time in the unit was an important consideration

13   and the three people who were promoted were already

14   line attorneys in the counterterrorism unit.  So I

15   accepted that as, you know, being true.  He asked me

16   if I wanted him to go speak to Ms. Farabee.

17       **Q.    She's being disrespectful to you by**

18   **raising her voice, right?**

19       A.    Well, she's threatening me.  You know, it

20   was more than being disrespectful.  She was

21   threatening me.  Undermining my professional

22   reputation.  So that was my real concern.  You know,

23   I'm not -- everybody likes to be liked, but I don't

24   cry if somebody doesn't like me, so I really didn't

25   care what she felt about me personally, but I didn't

1    want her hurting me professionally.

2        **Q.    You didn't feel disrespected at all when**

3    **she raised her voice at you?**

4        A.    Well, I did.  Of course.

5        **Q.    Go on.  I'm sorry, I interrupted.**

6        A.    You think that in a professional

7    environment that people will be able to express

8    themselves in a professional manner with a certain

9    amount of civility.  She failed to do that, but that

10   wasn't my primary concern.  So I explained that to

11   Mr. Rexach.  He asked me if I wanted him to go speak

12   to her.  I said no mainly because I just didn't want

13   to start a war.  I told him this, though:  That I

14   was concerned about there being an office-wide

15   e-mail coming from the supervisors discussing the

16   manner in which we communicate with the FBI and

17   what's deemed appropriate and if I saw that kind of

18   e-mail, I would have been under the assumption that

19   it was emanating from on high, from management, to

20   address the issue that Ms. Farabee would have raised

21   about what she believed to be my inappropriate

22   communication with the FBI.

23                    So I wanted him to know all the facts

24   before there was this discussion at a supervisor's

25   meeting at which I would not be present.  And I told

1    him very bluntly she lied about me before, I don't

2    think she'll have any hesitation to lie about me

3    again.  I want somebody to be aware of the lie when

4    it's told.  I want somebody in the room to be aware

5    of the lie and aware of the facts when it's told.

6                    But I did not want him to address it

7    because I just didn't want to, you know, create a

8    larger personnel issue between myself and

9    Ms. Farabee or have Ms. Farabee go to my new

10   supervisors.

11        Q.    So was that comment ever made at any

12   meeting that you heard of, that you were worried she

13   was going to make --

14        A.    I have no idea what she said and to whom

15   and I don't know what effect it may or may not have

16   had if she said something.  I don't know.

17        Q.    Let's just wrap up page 16 of Exhibit 5,

18   what's Bates stamped as 16.

19                    You say, "OI management's actions in

20   2009, coupled with those described above, in an

21   instance where I was the most qualified applicant

22   who satisfied the requirements of the job

23   announcement, establish a pattern of discrimination

24   by OI management."

25                    Can you expound on that a little bit?

1        A.    Sure.

2        **Q.    I mean beyond what you've said.  You've**

3        **already told us what you believe forms the basis of**

4        **the 2009.**

5        A.    Right.

6        **Q.    But beyond anything that you've already**

7        **said.**

8        A.    After the incidents that we just

9   described, when I applied for the deputy chief of

10   the Litigation Section position, I assume, based on

11   what Mr. Rexach had told me about time in the unit

12   being important, that my being in the Litigation

13   Section would help my application, would be seen as

14   a positive thing and help my application.

15                     At the end of the day, when we had

16   gone through the informal process and I learned that

17   Mr. Ridge had not submitted his law school

18   transcript, had not submitted a writing sample and

19   was not in the Litigation Section, it seemed to me

20   then that in the context of all that had happened

21   before, there was something personal to me that was

22   an impediment to my moving into supervisory ranks.

23                     So at the time those incidents

24   occurred, I didn't make any allegation of racial

25   discrimination because there didn't seem to me to be

1    anything blatant, no direct evidence of it. But put

2    in context with what occurred in the selection of

3    Mr. Ridge, if you look along the time line, there

4    was an application for a supervisory position, a

5    statement that is inaccurate about my communication,

6    a statement that is inaccurate about my filing my --

7    or the execution of my responsibilities, I get

8    denied that position. I'm provided with a threat to

9    disparage my reputation among my new supervisors. I

10   apply for a supervisor in the new section and they

11   hire a guy whose application isn't complete, who's

12   not in the section and doesn't have as much FISA

13   litigation experience as I.

14                    At that point, I say this is about

15   me. And what could it be about me? Well, it's not

16   about my years as a federal prosecutor. It's not

17   about my years as an attorney in the Office of

18   Intelligence. It's not about my FISA litigation

19   experience. It's not about the quality of the work

20   that I had done because I had been getting exceeds

21   fully successful and excellent overall ratings. And

22   it seemed time in the unit was an important

23   consideration when I was not in the unit. And time

24   in the unit was completely ignored when I was in the

25   Litigation Section and the position was available in

1    the litigation section.

2              So from that, I concluded that there

3    was a pattern that was going on here and there was

4    no other reason that I could see for my

5    non-selection.

6        Q.    Other than?

7        A.    Other than race.

8              MS. MOMENI:  I think this is a good place

9    for us to stop.

10             (Luncheon recess taken from 12:36 to 1:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA NESBITT<br>1629 Tucker Road<br>Fort Washington, Maryland 20744<br>301-573-3278<br><br>Plaintiff,<br>v.<br><br>ERIC H. HOLDER, JR.,<br>Attorney General, United States<br>Department of Justice<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

AFFIDAVIT OF SERVICE

RCL

Civil Action No. 12-717 (R̶W̶R̶)

City of Washington,
District of Columbia:

SHARIF ABDUR-RAHIM, being duly sworn, deposes and says that:

1.      The deponent is not a party to the action, is 21 years of age or older and resides at 9713
        Oxbridge Way, Bowie, Maryland 20721

2.       On the 19th day of June, 2013, the deponent served the following described documents
        upon the person or persons listed in paragraph 4: Plaintiff's Supplemental Opposition To
        Defendant's Motion For Summary Judgment, Plaintiff's Affidavit In Opposition
        To Defendant's Renewed Motion For Summary Judgment, Plaintiff's Supplemental
        Statement of Material Facts As To Which There Is No Genuine Dispute, Plaintiff's
        Supplemental Memorandum Of Points And Authorities In Opposition Of Defendant's
        Motion For Summary Judgement, and Plaintiff's Exhibit CC.

3.      The number of copies served on each said person was One.

4.    The method of Service on each said person was: By delivering the above-listed documents to the United States Postal Service in an envelope addressed as follows: To   Assistant United States Attorney Mercedeh Momeni, United States Attorney's Office for the District of Columbia, Civil Division, 555 4th Street, NW, Washington, D.C. 20530.


Dated: Washington, D.C.
          June 19, 2013


                                                            _____
                                                            SHARIF ABDUR-RAHIM


Sworn to before me this 19th day of May, 2013

Notary Public



```
7013 0600 0000 2315 7335
```

```
MARTIN LUTHER KING JR PO
WASHINGTON, Washington DC
       200059997
    1050050238 -0099
06/19/2013   (202)523-2001   01:07:06 PM
```

--------- Sales Receipt ---------

| Product Description | Sale Qty | Unit Price | Final Price |
|---|---|---|---|
| @@ WASHINGTON DC 20530 | | | $5.60 |
| Zone-1 Priority Mail | | | |
| 15.10 oz. | | | |
|  Expected Delivery: Thu 06/20/13 | | | |
|  Return Rcpt (Green Card) | | | $2.55 |
|  @@ Certified | | | $3.10 |
|  Label #: | 70130600000223157335 | | |

```
                          ========
Issue PVI:                 $11.25
```

```
Total:                     $11.25
```

```
Paid by:
Debit Card                 $11.25
  Account #:       XXXXXXXXXXXX9272
  Approval #:      000425
  Transaction #:   372
  23 902891845
  Receipt#:        000444
```

@@ For tracking or inquiries go to
USPS.com or call 1-800-222-1811.

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Order stamps at usps.com/shop or call
1-800-Stamp24. Go to usps.com/clicknship
to print shipping labels with postage. For
other information call 1-800-ASK-USPS.
*******************************************
*******************************************
Get your mail when and where you want it
with a secure Post Office Box. Sign up for
a box online at usps.com/poboxes.
*******************************************
*******************************************

```
Bill#: 1000101170123
Clerk: 23
```

      All sales final on stamps and postage
      Refunds for guaranteed services only
          Thank you for your business
*******************************************
*******************************************
          HELP US SERVE YOU BETTER

   Go to: https://postalexperience.com/Pos

        TELL US ABOUT YOUR RECENT
             POSTAL EXPERIENCE

           YOUR OPINION COUNTS
*******************************************
*******************************************


                Customer Copy